**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALEXANDER EMMANUEL RODRIGUEZ,

Plaintiff,

v.

MAJOR LEAGUE BASEBALL, OFFICE OF
THE COMMISSIONER OF BASEBALL and
MAJOR LEAGUE BASEBALL PLAYERS
ASSOCIATION,

Defendants.

JUDGE RAMOS

**COMPLAINT**

14 CV 0244

Plaintiff Alexander Emmanuel Rodriguez ("Plaintiff" or "Mr. Rodriguez"), by his attorneys, brings this Complaint pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate the Arbitration Award of the Major League Baseball Arbitration Panel (Fredric R. Horowitz, Chair), dated January 11, 2014. In support, Mr. Rodriguez alleges as follows:

RECEIVED
JAN 13 2014
U.S.D.C. S.D.N.Y.
CASHIERS

**PRELIMINARY STATEMENT**

1.      On August 5, 2013, Major League Baseball ("MLB") and its commissioner, Allan H. "Bud" Selig ("Commissioner Selig" or "Selig"), imposed an unprecedented 211 game suspension upon Mr. Rodriguez, alleging (without a positive test result) Mr. Rodriguez used illegal performance-enhancing substances ("PES") that are banned under the relevant collectively bargained agreements among MLB and Major League Baseball Players Association ("MLBPA"). After Mr. Rodriguez filed a Grievance (as defined below) challenging this wholly unjustified suspension and the baseless and unprecedented allegations upon which it was premised, a 12 day arbitration hearing was held at MLB's headquarters in New York before a three-member arbitration panel chaired by Arbitrator Fredric R. Horowitz (the "Arbitrator" or

"Arbitrator Horowitz").  The hearing culminated in an award, dated January 11, 2014, reducing

the unprecedented suspension to a still wholly unjustifiable suspension of 162 games (the

"Arbitration Award").[1]  This action seeks to vacate that Arbitration Award, to hold MLBPA

responsible for its breaches of the duty of fair representation owed to Mr. Rodriguez prior to and

during the Grievance process, and to hold MLB responsible for its violation of the collectively

bargained agreements between MLB and MLBPA by imposing a suspension upon Mr.

Rodriguez without just cause.

2.     As set forth fully below, the Arbitration Award must be vacated because, among

other things, it does not draw its essence from the collectively bargained agreements between

MLB and MLBPA; it demonstrates that Arbitrator Horowitz exhibited a manifest disregard for

the law; it makes clear that Arbitrator Horowitz acted with evident partiality; and the record in

the arbitration makes clear that Arbitrator Horowitz refused to entertain evidence that was

pertinent and material to the outcome.

3.     For example, as set forth fully below, during the Grievance proceedings

Arbitrator Horowitz – who has been widely described as a hard core baseball fan – repeatedly

took actions that evidenced his blatant partiality toward MLB and were in disregard of well-

settled legal principles.  These actions include, among other things, his decisions:  (i) to deprive

Mr. Rodriguez of his right to select a fair and impartial arbitrator to represent his interest on the

Arbitration Panel; (ii) to deprive Mr. Rodriguez of his right to face his accuser and examine

Commissioner Selig, the man responsible for imposing Mr. Rodriguez's unprecedented

suspension, who was described in testimony during the arbitration as the sole ultimate decision

maker; (iii) to deprive Mr. Rodriguez of his right to a full and complete cross-examination of

---

[1]     A true and correct copy of the Arbitration Award is attached hereto as Exhibit A.

Anthony Bosch, the primary fact witness whom MLB relied upon in imposing the unprecedented suspension; (iv) to deprive Mr. Rodriguez of his right to inspect the BlackBerry devices which MLB claims contained the material correspondence between Mr. Rodriguez and Bosch concerning the alleged used of banned substances; and (v) permitting MLB and its officials – including one member of his own Arbitration Panel – to continuously leak confidential and prejudicial information concerning Mr. Rodriguez and the arbitration to the media.  These are only some of the many egregious actions taken by Arbitrator Horowitz during the Grievance process, each of which standing alone warrants vacatur of the Arbitration Award; and together they demonstrate the inherent unfairness and pre-ordained result attendant to the arbitration process.

4.      As if this were not enough, MLBPA – the exclusive bargaining representative for Mr. Rodriguez and all MLB players, and supposedly the most powerful union in sports – completely abdicated its responsibility to Mr. Rodriguez to protect his rights under the agreements between MLB and MLBPA by:  failing to intervene to stop the continuous leaking of prejudicial information concerning Mr. Rodriguez and the Grievance by MLB and its officials; failing to stop MLB's commencement of a sham lawsuit in Florida solely aimed at obtaining evidence to be used against MLB players like Mr. Rodriguez; and failing to stop the abusive investigative tactics taken by MLB and its investigators to obtain evidence against Mr. Rodriguez.  To make matters worse, MLBPA even went so far as to make public statements to the media, through its Executive Director, falsely declaring Mr. Rodriguez's guilt and stating that he should accept a suspension and resolve the Grievance at issue – all, of course, without Mr. Rodriguez's consent and without even consulting with him.

5.     MLBPA determined early on that it did not want to "take on" MLB over the alleged use of PES by Mr. Rodriguez and, instead, would "save its fire" for other issues where it would be across the table from MLB.  As a result, it engaged in numerous acts that were arbitrary, capricious and taken in bad faith, each of which constitutes a breach of MLBPA's duty of fair representation, and each of which have undermined the entire Grievance process to Mr. Rodriguez's detriment.

6.     This inaction by MLBPA created a climate in which MLB felt free to trample on Mr. Rodriguez's (and indeed all players') confidentiality rights.  Indeed, just last night, in an unprecedented breach of confidentiality, Commissioner Selig, MLB COO Rob Manfred (himself a panelist at the arbitration), and MLB's central witness, Bosch, appeared on the national television program *60 Minutes* in a long planned, pre-taped, carefully orchestrated smear campaign against Mr. Rodriguez.  In this segment, extensive evidence from the arbitration was disclosed without, of course, the corresponding cross-examination and/or contrary arguments presented by Mr. Rodriguez.

7.     This unseemly display further undermines the credibility of the Grievance procedure and should and will cause MLB players to have to think twice before challenging MLB's actions in the future for fear that their entire case will be laid bare on national television, rather than respected as confidential.  MLB's intended message has already had its effect, with numerous players expressing concern that their rights are being trampled immediately upon airing of the *60 Minutes* piece.

8.    In sum, as set forth fully below, the Grievance process was tainted against Mr. Rodriguez, and the Arbitration Award – which is based solely upon inadmissible hearsay and selective and unreliable documents and testimony – must be vacated.

## PARTIES

9.    Plaintiff, Alexander Rodriguez, is an individual residing in Tampa, Florida.

10.    Defendant Major League Baseball is an unincorporated association whose members are the 30 Major League Baseball Clubs.  MLB is headquartered at 245 Park Avenue, New York, New York, 10167.

11.    Defendant Office of the Commissioner of Baseball ("OCB") is an office created pursuant to the Major League Agreement entered into by the member clubs of Major League Baseball, and is located at 245 Park Avenue, New York, New York.  Upon information and belief, the OCB has the power to act for and bind MLB in business matters centralized in the league.

12.    Defendant Major League Baseball Players Association is a labor organization representing Plaintiff and other professional MLB ballplayers.  MLBPA is headquartered at 12 East 49th Street, New York, New York 10017.

## JURISDICTION AND VENUE

13.    Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the claims presented herein arising under the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C. § 185.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants conduct business in this District, Defendants are subject to personal jurisdiction in this District, and the arbitration took placed in this District.

## STATEMENT OF FACTS

### I.     BACKGROUND

15.     This case arises out of the Arbitration Award dated January 11, 2014 wherein the Arbitrator upheld in part an unprecedented, 211 game suspension of Mr. Rodriguez for alleged violations of the collectively bargained agreements between MLB and MLBPA.

16.     MLBPA is the union that represents professional MLB players.  In 1968, it entered into the first collective bargaining agreement, the Basic Agreement ("BA"), with MLB. This agreement governs the terms and conditions of MLB players' employment.  The current agreement was entered into by MLB and MLBPA on December 12, 2011, and expires on December 1, 2016.

17.     In addition, MLBPA entered into a Joint Drug Prevention and Treatment Program (the "JDA" and together with the BA, the "Agreements") with MLB, which seeks to deter the use of banned substances, including anabolic steroids and other PES, and to "provide for... an orderly, systematic, and cooperative resolution of any disputes that may arise concerning the existence, interpretation, or application" of the policy itself.

18.     MLB and MLBPA amended the Joint Drug Agreement to allow for a more rigorous system of testing and punishment for use of PES.  Among the changes were: the expansion of surprise mandatory testing of ballplayers from one to two times a year, an increase

in the number of substances tested for, to a total of eighty-five, and the enlargement of penalties from a ten-game suspension for first time users to fifty games, and from a thirty to a 100 game suspension for a second offense. These penalties for PES usage remain in effect today.

19.     In January 2013, the JDA was once again amended, this time to allow for the use of in-season testing for human growth hormone, and other enhanced testing techniques.

20.     In addition to setting forth a disciplinary structure for PES use, the JDA recognizes that the confidentiality of player information is "essential to the Program's success" and prohibits the revelation of information "relating to a Player's involvement in the Program."

21.     The Notice of Discipline in this matter was served on August 5, 2013 pursuant to Section 7.G.2 of the JDA and Article XII(B) of the BA. The Notice of Discipline – signed by Commissioner Selig – imposed an unprecedented 211 game suspension on Mr. Rodriguez and stated, among other things, that such suspension was based upon Mr. Rodriguez's (i) "intentional, continuous and prolonged use and possession of [PES]" and (ii) attempts to cover up violations of the program by obstructing MLB's investigation of Biogenesis of America, LLC ("Biogenesis") and Bosch. The Notice was issued, in part, on the basis of evidence adduced in a lawsuit filed by MLB in Florida state court (the "Biogenesis Suit").

22.     As a result of the Notice of Discipline, Mr. Rodriguez filed a Grievance stating that the suspension "constitute[d] discipline without just cause…and [was] otherwise improper" (the "Grievance"). A 12-day arbitration Hearing occurred at MLB's headquarters in New York on September 30, 2013 - October 4, 2013; October 16, 2013 - October 18, 2013; and November 18, 2013 - November 21, 2013 (the "Hearing").

- 7 -

23.     During the Hearing, MLB produced and proffered wholly unauthenticated documents and hearsay evidence – in many instances third and even fourth party hearsay – all obtained by theft, coercion or payment, as the basis for its suspension of Mr. Rodriguez. Arbitrator Horowitz permitted all of this dubious evidence to be placed into the record, and ultimately relied upon much of it in his Arbitration Award.

24.     Arbitrator Horowitz ultimately issued an Arbitration Award on January 11, 2014, upholding Mr. Rodriguez's suspension in large part, resulting in a suspension of 162 games plus the 2014 postseason, if applicable.  This decision clearly does not draw its essence from the Agreements; reflects the partiality of the Arbitrator; constitutes an egregious manifest disregard for the law; and highlights Arbitrator Horowitz's misconduct, specifically the exclusion of evidence pertinent and material to the controversy.

25.     To make matters worse, prior to and during this Grievance process, MLBPA has idly stood by while MLB has run roughshod over the protections afforded by the Agreements. And before the arbitration process began, the Executive Director of MLBPA appeared on a national radio show, declared Mr. Rodriguez's guilt based on his review of the evidence, and stated that he should accept some amount of punishment.  Such behavior makes clear beyond cavil MLBPA's own prejudicial attitudes toward Mr. Rodriguez, and demonstrates unquestionably its failure to fully and fairly defend Mr. Rodriguez.  Simply put, MLBPA acted arbitrarily, discriminatorily, and in bad faith, undermining the entire Grievance process.

## II.     MLBPA'S BREACH OF THE DUTY OF FAIR REPRESENTATION

26.     As Mr. Rodriguez's exclusive collective bargaining representative, MLBPA has a duty to represent all MLB players, including Mr. Rodriguez, fairly, in good faith, and without

discrimination pursuant to federal labor law.  MLBPA has violated this duty at every turn of

MLB's campaign against Mr. Rodriguez by, among other things: (i) refusing to act upon Mr.

Rodriguez's requests that MLBPA object to MLB's breaches of the Agreements; (ii) refusing to

act on Mr. Rodriguez's multiple requests to intervene in and seek dismissal of a sham state court

proceeding designed to inappropriately amass evidence against Mr. Rodriguez; and (iii) making

derogatory public statements about Mr. Rodriguez, including its Executive Director appearing on

a national radio show, declaring Mr. Rodriguez's guilt based on his review of the evidence, and

stating that he should accept some amount of punishment. Despite having these issues brought to

its attention, MLBPA refused to allow Mr. Rodriguez to select an arbitrator of his choosing.

These violations by MLBPA seriously undermined the fairness and impartiality of the arbitration

process and Mr. Rodriguez's Grievance.

### A.  MLBPA's Failure to Act in Response to MLB's Rampant Breaches of the Confidentiality Provisions of the JDA

27.     Despite the firm restrictions on the disclosure of any information concerning an

investigation into compliance with the JDA, or even its existence, MLB and its agents violated

the letter and spirit of the agreement by continuously leaking information about the investigation

into Mr. Rodriguez to multiple media outlets.  As a result, the play-by-play of MLB's

investigation into Mr. Rodriguez and other players was reported on a daily basis in newspaper

reports and media outlets around the country.  Despite Mr. Rodriguez's appeals to take action in

the face of such blatant violations, MLBPA arbitrarily stood by and permitted MLB to breach the

Agreements, in violation of the union's duty to fairly represent Mr. Rodriguez's interests.

28.     The JDA prohibits MLB and MLBPA from disclosing information concerning the

investigation or testing conducted, or discipline enacted pursuant to the JDA to "the public, the

media or other Clubs." Moreover, the JDA prohibits revealing "[a]ny and all information relating to a Player's involvement in the Program, including...the results of any Prohibited Substance testing to which the Player may be subject, and any discipline imposed upon the player." The **only** public disclosure permitted by the JDA is the name of a player suspended pursuant to the agreement, and the term of the suspension.

29.     MLB has consistently violated the confidentiality provision of the JDA by leaking information, and misinformation, concerning the discipline imposed upon Mr. Rodriguez and the supposed evidence amassed by MLB. Indeed, despite the fact that the only public disclosure that should have been made was that Mr. Rodriguez had been suspended for 211 games, MLB disseminated details about Mr. Rodriguez's suspension on the day it was issued in a press release stating:

> Rodriguez's discipline under the Joint Drug Prevention and Treatment Program is based on his use and possession of numerous forms of prohibited performance-enhancing substances, including Testosterone and human Growth Hormone, over the course of multiple years. Rodriguez's discipline under the Basic Agreement is for attempting to cover-up his violations of the Program by engaging in a course of conduct intended to obstruct and frustrate the Office of the Commissioner's investigation.

30.     Both before and after the issuance of the Notice of Discipline, MLB leaked "chapter and verse" about its investigation and the suspension. Such leaks have included:

- **February 1, 2013:** Several sources, speaking on the condition of anonymity, told ESPN that documents they reviewed detailed the drug regimens and schedules Mr. Rodriguez allegedly received.[2]

---

[2]     T.J. Quinn and Mike Fish, Sources: *Bosch injected A-Rod*, ESPN, (February 1, 2013), *available at* http://espn.go.com/espn/otl/story/_/id/8904501/operator-miami-clinic-linked-peds-mlb-treated-yankees-alex-rodriguez-directly.

- **June 5, 2013:** "Two baseball sources" told the *New York Daily News* that MLB was hoping to consummate a deal that would lead to a "100-game" suspension for Mr. Rodriguez.[3]

- **June 26, 2013:** "[S]ources close to the ongoing drama" told the *New York Daily News* that Mr. Rodriguez intended to claim that he was physically unable to perform immediately after returning to the active roster so that he could collect his entire salary before MLB suspended him. The source was quoted as saying: "It's all about him getting his money and not losing it to suspension."[4]

- **July 22, 2013:** ESPN reported that "sources familiar with the investigation" said the evidence connecting Rodriguez to Biogenesis is "far beyond" what the league had against Braun.[5]

- **July 31, 2013**: A "person familiar with the discussions" told the Associated Press "on condition of anonymity because no statements were authorized," that MLB was "threatening to kick Mr. Rodriguez out of the game for life unless the New York Yankees star agrees not to fight a lengthy suspension for his role in the sport's latest drug scandal."[6]

- **August 4, 2013:** Sources "familiar with baseball's investigation" told *Sports Illustrated* that MLB was prepared to announce Mr. Rodriguez's suspension for the remainder of this season and all of next season for allegedly using PES and interfering with MLB's investigation. They further noted that the planned suspension could effectively end Mr. Rodriguez's career.[10]

- **August 5, 2013:** *New York Daily News* reporter Bill Madden appeared on a news show on SNY TV, stating that baseball sources told him that they did not seek a lifetime ban on Mr. Rodriguez because it would face a skeptical reception before the arbitrator, and because the 211 game ban would effectively end Mr. Rodriguez's career.

---

[3]    Bill Madden, *JUICE IS SPILLING MLB seeks to ban A-Rod & others with clinic founder near deal to share detail*, N.Y. DAILY NEWS, (June 5, 2013), at Sports p. 56.

[4]    Bill Madden, *Yankees' Alex Rodriguez planning to return and retire to collect fat salary before MLB suspension hits: sources*, N.Y. DAILY NEWS, (June 26, 2013), *available at* http://www.nydailynews.com/sports/i-team/sources-a-rod-hoping-cash-114-m-mlb-nails-article-1.1383664#ixzz2bxQjD689.

[5]    Wallace Matthews, *Source: A-Rod tries to make deal with MLB*, ESPN, (July 22, 2013), *available at* http://espn.go.com/blog /new-york/yankees/post/_/id/60347/source-a-rod-trying-to-make-deal-with-mlb.

[6]    Ronald Blum, *Person familiar with discussions: MLB threatening Rodriguez with lifetime ban in drug probe*, ASSOCIATED PRESS, (July 31, 2013), *available at* http://www.startribune.com/sports/twins/mlb/217708251.html.

[10]    Tom Verducci, *Years of Mistrust Color MLB's Impending Suspension of Alex Rodriquez*, SPORTS ILLUSTRATED, (August 4, 2013), *available at* http://mlb.si.com/2013/08/04/alex-rodriguez-suspension-mlb-biogenesis-ped/.

- **August 5, 2013:** The Associated Press reported specific details of the "confidential" evidence MLB amassed against Plaintiff and the other suspended ballplayers, including, BlackBerry instant message transcripts, records of text messages, and Facebook profiles.[7]

- **August 19, 2013:** In an interview with ESPN's Outside the Lines, T.J. Quinn stated that he had "seen" and received descriptions of certain of MLB's alleged evidence concerning Mr. Rodriguez.

- **September 1, 2013:** *New York Post* reporter Joel Sherman reported details of MLB's evidence obtained from Bosch, including the timing of alleged PES usage.[8]

- **September 24, 2013:** The *New York Daily News* stated that MLB will open the proceedings and produce Bosch, who is expected to authenticate and explain what sources have described as a devastating trove of documentary evidence.[9]

- **September 27, 2013:** "One baseball person" told the *New York Daily News* regarding Mr. Rodriguez that "What you have here is a player who has purposely engaged in activity designed to save his butt, despite the fact that he knows damn well he's guilty."[10]

- **October 2, 2013:** The *New York Daily News* incorrectly reported that Mr. Rodriguez's "introduction" to his case included the argument that he believed he was taking innocent legal supplements, although he was obtaining illegal supplements from Bosch.[11]

- **October 16, 2013:** The *New York Daily News* reported that during Bosch's testimony in the Hearing, the Biogenesis founder "authenticated a pile of documents and electronic communications" that MLB says reflect the League's conclusion that Rodriguez acquired banned substances from Bosch.[12]

31.    MLB's leaks were not limited to allegations concerning Mr. Rodriguez's

supposed PES use and his suspension. In April 2013, media outlets started reporting

---

[7]    *Electronic trail helped MLB with bans*, ASSOCIATED PRESS, (August 5, 2013), *available at* http://espn.go.com/mlb/story/_/id/9546552/mlb-built-biogenesis-case-facebook-texts-report-says.

[8]    Joel Sherman, *2009 Words Get in the Way of A-Rod's 2013 PED Explanation*, N.Y. POST, (September 1, 2013) *available at* http://www.nypost.com/p/sports/more_sports/words_get_in_way_of_rod_ped_explanation_PA0Qn88DiFSIkUm1ry RztM/1.

[9]    Teri Thompson, Michael O'Keefe, Christian Red and Nathaniel Vinton, *Yankees slugger Alex Rodriguez, MLB set to take swings in PED duel*, N.Y. DAILY NEWS, (September 24, 2013), *available at* http://www.nydailynews.com/sports/i-team/juicy-fight-a-rod-mlb-set-swings-ped-duel-article-1.1466734

[10]    Bill Madden, *A-Rod done both on and off field*, N.Y. DAILY NEWS, (September 27, 2013), at Sports p. 56.

[11]    Teri Thompson, Michael O'Keefe, Christian Red and Nathaniel Vinton, *Alex Rodriguez tells panel he was duped into taking steroids: source*, N.Y. DAILY NEWS, (October 2, 2013), *available at* http://www.nydailynews.com/sports/i-team/a-rod-tells-panel-duped-steroids-source-article-1.1473603.

[12]    Teri Thompson, Michael O'Keefe, Bill Madden and Nathaniel Vinton, *MLB's HEAVY HITTER COO Manfred up next in A-Rod case*, N.Y. DAILY NEWS, (October 16, 2013), at Sports p. 59

(incorrectly) that Mr. Rodriguez interfered with MLB's investigation by attempting to pay off witnesses and buy and destroy incriminating documents.  The leaked reports, either explicitly or implicitly attributed to MLB and its agents include:

- **April 12, 2013:** "Multiple baseball sources" told the *New York Daily News* that Mr. Rodriguez bought Biogenesis documents in order to keep them from MLB investigators.[13]
- **April 12, 2013:** *Yahoo Sports* reported that according to "two people briefed on the matter," investigators for Major League Baseball uncovered evidence that a representative of Alex Rodriguez purchased medical records from a person connected to Biogenesis.[14]

32.     One particularly egregious example of MLB's leaks was vividly demonstrated on August 13, 2013, when *New York Daily News* columnist Bill Madden appeared for an interview on WFAN's Mike Francesa Show where he discussed confidential details of Mr. Rodriguez's investigation, punishment, and appeal.  Mr. Madden stated several times in the interview that the information he discussed was known only to MLB, and was provided to Madden by MLB officials.

33.     On August 22, 2013, in response to Mr. Madden's statements, Mr. Rodriguez implored MLBPA to take action and defend his rights by initiating a Grievance against MLB, or by other means.  In a reply letter, dated that same day, MLBPA declined to do so and simply stated it "disagreed" with Mr. Rodriguez's contention that the MLBPA had failed to fairly and effectively represent his interests in connection with the matter

---

[13]     Bill Madden, *Sources: Alex Rodriguez bought Biogenesis documents as MLB probe into latest doping scandal intensifies*, N.Y. DAILY NEWS, (April 12, 2013), *available at* http://www.nydailynews.com/sports/i-team/sources-a-rod-bought-biogenesis-documents-article-1.1315322#ixzz2bs4HyThO.

[14]     Mark Townsend, *Reports: Representatives for Alex Rodriguez purchased Biogenesis documents*, YAHOO SPORTS, (April 12, 2013), *available at* http://sports.yahoo.com/blogs/mlb-big-league-stew/report-representatives-alex-rodriguez-purchased-biogenesis-documents-222949996--mlb.html.

34.     On September 27, 2013, the *New York Law Journal* stated that the *Daily News*, which clearly has become MLB's paper of record, sought sealed and confidential grand jury testimony.  In its request, the *Daily News* cited a "'good faith' belief" that the documents pertained to Mr. Rodriguez.  MLB also sought this same confidential information.  On the same day the *Daily News* attempt was disclosed, Mr. Rodriguez requested that MLBPA bring this outrageous conduct to Arbitrator Horowitz's attention.  MLBPA declined this invitation.

35.     On October 23, 2013 the *Daily News* described BlackBerry Messenger conversations between Mr. Rodriguez and Tony Bosch that were central to MLB's case against Mr. Rodriguez, and as such, were to remain confidential.[15]

36.     In response, shortly thereafter, Mr. Rodriguez pled with MLBPA to take "immediate and forceful action" to "remedy the untenable state of affairs" created by MLB's blatant disregard for its confidentiality obligations.  Mr. Rodriguez requested that the MLBPA institute an action in federal court seeking the enforcement of the confidentiality provisions of the Agreements.  Such action remained the only possible remedy as MLB repeatedly ignored the orders and admonitions of confidentiality from Arbitrator Horowitz.  In response, the MLBPA refused, stating that the proper venue was the ongoing Grievance procedure – a procedure that had proven entirely ineffective at halting MLB's media campaign.

37.     In the face of MLB's consistent disregard of its confidentiality obligations under the Agreements, Mr. Rodriguez repeatedly appealed to the MLBPA to take action and to stop MLB's incessant leaks to the media.  MLBPA, apparently fearful of standing up to MLB, and

---

[15]     Teri Thompson and Michael O'Keefe, *Legal Team Admits Alex Rodriguez Bought Evidence Linked to Biogenesis Investigation,* N.Y. DAILY NEWS, (October 23, 2013), *available at* http://www.nydailynews.com/sports/i-team/a-rod-reps-yes-bought-evidence-stand-article-1.1494837.

without good reason, did nothing to stop these blatant violations of the Agreements, completely

abdicating the responsibility owed to Mr. Rodriguez and undermining the credibility of the

arbitration process.

38.     As noted earlier, MLB's tactics continue to date, with the airing of extensive

evidence from the arbitration proceeding on last night's episode of *60 Minutes*.

**B.     MLB's Suit Against Biogenesis And
        MLBPA'S Failure to Take Any Action in Response**

39.     In January 2013, the *Miami New Times*, a free weekly tabloid, published

documents provided to it by Porter Fischer, a disgruntled former employee of Biogenesis, an

anti-aging clinic located in Coral Gables, Florida.  The documents purportedly identified a

number of MLB players who used the clinic to obtain human growth hormone and other PES.

Mr. Fischer's stated purpose in releasing the documents he stole from Biogenesis was to

embarrass the owner of the clinic, Bosch, who Fischer believed owed him some back pay and

other monies.  Among the players allegedly connected to Biogenesis was Mr. Rodriguez.

40.     Upon information and belief, MLB had been investigating Biogenesis to little

effect since the summer of 2012.  The *Miami New Times* publication, however, breathed new life

into MLB's inquiry.  MLB and Commissioner Selig quickly jumped at the opportunity to appear

tough on PES, and, although more than a dozen players were identified in the Biogenesis

documents, Mr. Rodriguez soon became the main target of MLB's highly publicized

investigation.

41.     On March 22, 2013, MLB sued Bosch, Biogenesis and others in Miami-Dade

County Circuit Court, in order to obtain discovery of the Biogenesis documents discussed in the

*Miami New Times* article, among others.  Although MLB alleged that the defendants in the

Biogenesis Suit were causing harm to MLB through tortious interference, MLB's true purpose

for the Biogenesis Suit was to seek "evidence" that would allow MLB to publicly shame Mr.

Rodriguez and to interfere with his career and business dealings.

42.     MLB's suit was immediately criticized by the sports and legal community as

lacking merit, and for skirting the procedural safeguards concerning MLB investigations found

in the Agreements.  For example, one attorney affiliated with NBC Sports wrote that MLB's suit

was: "[A] transparent and cynical attempt by Major League Baseball to obtain documents to

discipline its employees, not an attempt to vindicate an actual legal injury, and courts do not like

to be used in such a fashion…They are now suing with the sole intent of getting documents.

Which is problematic because the purpose of the legal system is to redress legal injury, not to be

used as a cudgel in some employment dispute involving non-parties to the lawsuit or to help

sports leagues with their public relations problems."[16]

43.     Similarly, a University of Georgia sports law professor opined in a Reuters article

that he "doubt[s] Major League Baseball cares much about getting damages from these people…

It's about getting to the discovery."[17]  A columnist for *Sports Illustrated* called the Biogenesis

Suit "a desperation move with little chance of success."  Such statements regarding the true

purpose of the Biogenesis Suit have proven accurate.

---

[16]     Craig Calcaterra, *Major League Baseball's lawsuit against Biogenesis should be laughed out of court*, NBC HARD TALK SPORTS, (March 22, 2013), *available at* http://hardballtalk.nbcsports.com/2013/03/22/major-league-baseballs-lawsuit-against-biogenesis-should-be-laughed-out-of-court/.

[17]     Joseph Ax, *Analysis: In suing clinic over drugs, U.S. baseball may be targeting players*, REUTERS, (March 24, 2013), *available at* http://articles.chicagotribune.com/2013-03-24/sports/sns-rt-us-usa-baseball-lawsuitbre92n0mw-20130324_1_biogenesis-florida-clinic-miami-new-times.

44.     Immediately after filing its complaint, MLB began aggressively pursuing discovery, serving subpoenas for documents and testimony on numerous parties and non-party witnesses including Carlos Acevedo, Juan Carlos Nunez, Ricardo Martinez, Biokem LLC, Porter Fischer, Marcelo Albir, BioGenesis of America LLC, Anthony P. Bosch, RPO, LLC, Paulo da Silveira, AT&T, Federal Express, and T-Mobile. This initial round of discovery was quickly followed up with additional discovery requests, served upon, at least, an additional eleven individuals and entities.

45.     The swift timing and extensive scope of the discovery sought by MLB demonstrates that a plan to obtain evidence was in place well before the filing of the complaint, shedding light on the true motive for the Biogenesis Suit.

46.     MLB's fervent quest for discovery did not stop with its initial subpoenas. MLB has relentlessly harassed individuals by cancelling and re-noticing depositions countless times. For example, Lazaro Collazo has been served with at least four notices and re-notices of subpoenas for videotaped deposition.

47.     Likewise, on August 1, 2013 MLB requested an emergency hearing to address Mr. Fischer's compliance with subpoenas for documents despite his not being represented by an attorney. Notably, this "emergency hearing" to compel production was requested to take place on August 2nd. The matter was preliminarily heard on August 8th with a continued hearing taking place on August 21st, after MLB had imposed its discipline and Mr. Rodriguez had appealed, thus highlighting that the only "emergency" was that MLB now faced an arbitration against Mr. Rodriguez where it would have to defend its unprecedented suspension.

48.     Not satisfied with the foregoing, on August 22nd, in a brazen attempt to breach Mr. Rodriguez's attorney-client privilege, and in a further attempt to gather evidence for the arbitration, MLB issued a Notice of Production from Non-Party to Black, Srebnick, Kornspan & Stumpf, Mr. Rodriguez's former attorneys, seeking documents concerning their representation of Mr. Rodriguez.  Notably, such documents have no relevance to the Biogenesis Suit and, as a result, that same day, Mr. Rodriguez's counsel asked MLBPA to take action including, but not limited to, seeking to quash these baseless subpoenas – but MLBPA did nothing.

49.     MLB clearly breached the Agreements by operating outside the BA to amass evidence through the Biogenesis case, and continuing to collect such evidence after Mr. Rodriguez's suspension was announced, despite the fact that such evidence can have no bearing on MLB's prior decision to suspend Plaintiff.

50.     Moreover, MLB's improper tactics were not limited to subpoenas and motion practice but also included its scorched-earth approach to conducting an investigation.  On June 21, 2013, the *New York Daily News* reported that the former University of Miami pitching coach Lazaro (Lazer) Collazo, a defendant in the Biogenesis Suit, told the *News* that MLB investigators intimidated him and his family at his Miami home in March seeking information concerning their investigation.  Similar allegations were made by a lawyer representing another defendant in the Biogenesis Suit, Carlos Acevedo.

51.     Although in its complaint, MLB claimed that it brought the Biogenesis Suit to "preserve and enhance the integrity of the game and the image of baseball" (Biogenesis Complaint ¶13), MLB Defendants quickly demonstrated that such integrity did not extend to the prosecution of their investigation.

52.     First, MLB obsessed over maintaining control over the flow of information in the
investigation, even at the expense of prosecuting those allegedly complicit in the doping scheme.
For example, on June 10, 2013, attorneys for defendant Marcelo Albir sought discovery of
documents related to MLB's investigation of Biogenesis, as well as depositions of MLB officials
involved in the investigation.  Rather than reveal any facts about its investigation – except those
that they controlled through leaks to the media – the Commissioner voluntarily dismissed his suit
against Albir, who they previously alleged distributed banned PES to MLB players (Biogenesis
Complaint ¶ 31), thus demonstrating that MLB Defendants cared more about controlling the
information concerning the investigation than punishing those who allegedly enabled and
facilitated violations of the Joint Drug Agreement.

53.     Second, while busily leaking reports to the media alleging that Mr. Rodriguez was
interfering with their investigation, MLB officials were engaged in the very conduct they
accused Mr. Rodriguez of perpetrating.  On April 11, 2013, the *New York Times* reported that
MLB officials were offering cash payments to former Biogenesis employees in exchange for
their testimony.  The *Times* also reported that MLB was paying a former Biogenesis employee
for documentary evidence in the case.  One of the baseball sources quoted in the article
attempted to justify MLB's conduct by noting that the payments would not exceed "several
thousand dollars."  On June 20, 2013, the *Miami New Times* interviewed Porter Fischer, the
former Biogenesis employee.  In the interview, Fischer provided more details on MLB's attempt
to bribe him.  He told the *New Times* that MLB investigators offered him a $1,000 per week

salary as a consultant if he would cooperate, and on another occasion, offered him $125,000 for

all the Biogenesis records he had and an affidavit attesting to their authenticity.[18]

54.     Third, MLB's investigators harassed, intimidated and pressured individuals who

they wanted to testify, including:

- Jorge Velasquez, the owner of Boca Body Rejuvenation Center.  From January through March 2013, MLB investigators harassed and threatened Mr. Velasquez at his home and place of business.  The investigators approached Mr. Velasquez's landlord, a doctor, and implied that Velasquez was under investigation by the state attorney, resulting in the landlord expelling Velasquez.

- Peter Carbone, the operator of a tanning salon.  Carbone was offered $200,000 to cooperate with MLB's investigation.  When Carbone refused their offer, they harassed and persecuted him, including by impersonating police officers, and forcing his car to the side of the road while he was driving.

- Marcelo Albir, a former University of Miami ballplayer.  MLB's counsel misidentified himself to Albir as a law-enforcement officer, and threatened law enforcement action if Albir did not cooperate.  As discussed above, MLB dropped its claims against Albir in an effort to avoid exposing its unethical tactics.

55.     MLB's ethically challenged behavior reached rock bottom in their negotiations

with  Bosch, the alleged mastermind who controlled Biogenesis.  Multiple media outlets have

reported that MLB negotiated with Bosch to drop its suit against him in exchange for his full

cooperation in providing evidence and testimony against MLB players.  In exchange for his

assistance, MLB has also promised to provide Bosch with personal security, pay his legal bills,

and indemnify him for civil liability that may arise from his cooperation.  Mr. Bosch – MLB's

---

[18]      Tim Elfrink, *MLB Steroid Scandal: How Porter Fischer Exposed the Coral Gables Clinic*, MIAMI NEW TIMES, (June 20, 2013), *available at* http://www.miaminewtimes.com/2013-06-20/news /mlb-steroids-alex-rodriguez/full/.

"star" witness – is now under investigation by at least the U.S. Attorney's Office in Miami for providing steroids to minors.[19]

56.     While MLB was busy trampling on ballplayers' rights in Florida state court, MLBPA sat on its hands in New York.  Indeed, on June 11, 2013, counsel for Mr. Rodriguez wrote to MLBPA requesting that MLBPA "immediately intervene in the Biogenesis [Suit], move for its dismissal, and seek a stay pending a final ruling on the motion to dismiss" and "[s]imultaneously file a [g]rievance to halt MLB's egregious investigatory tactics."  The June 11th letter, which was followed by multiple requests for MLBPA to intervene in the Biogenesis Suit, also furnished MLBPA with details of the harassing and unethical investigatory conduct perpetrated by MLB.  In the face of such overwhelming wrongdoing by MLB and in response to Mr. Rodriguez's pleas, MLBPA took no action to stem MLB's rampant misconduct with respect to the Biogenesis Suit.

57.     Again, on August 22, 2013, Mr. Rodriguez's counsel submitted a letter to the MLBPA outlining the need for MLBPA to either intervene in the Biogenesis Suit or commence a federal lawsuit to assert preemption of MLB's inappropriate state court lawsuit.  MLBPA responded to Mr. Rodriguez's appeals for fair representation by taking no action.  To compound its wrongdoing, MLBPA, upon information and belief, leaked the August 22nd letter from Mr. Rodriguez's counsel to the media.  Indeed, an October 5, 2013 *New York Times* article reported details of the letter.[20]

---

[19]     Julie K. Brown, *Grand jury digs into MLB steroid use*, Miami Herald, (August 16, 2013), *available at* http://www.miamiherald.com/2013/08/16/3567784/grand-jury-digs-into-mlb-steroid.html#storylink=cpy.

[20]     Serge F. Kovaleski and Steve Eder, *Rodriguez, Citing Missed Opportunities, Rejected the Players Union*, NEW YORK TIMES, (October 5, 2013), *available at* http://www.nytimes.com/2013/10/06/sports/baseball/a-frustrated-rodriguez-turns-on-the-players-union.html?_r=0.

- 21 -

58.    Also on August 22nd, MLBPA refused to intervene in the Biogenesis Suit to quash a subpoena that MLB issued to Mr. Rodriguez's former public relations firm, baselessly stating that any motion would be "vigorously opposed" and was unlikely to "be decided in time to have an impact on the scope or timing of discovery."

59.    In sum, MLBPA did nothing to stop the blatant violations of the BA and the JDA by MLB, nor did MLBPA seek to intervene in MLB's improper lawsuit or to file its own federal lawsuit to assert preemption of MLB's improper state lawsuit under the Labor Management Relations Act. MLBPA's failure to take action to protect the sanctity of the BA, the JDA, and the arbitration process is uniquely harmful to Plaintiff's rights since, as the players' sole collective bargaining representative, MLBPA is the best, and indeed arguably the sole, party with standing to effectively mount such a challenge. MLBPA's failure to take any action to protect Mr. Rodriguez in the wake of MLB's misconduct with respect to the Biogenesis Suit permitted MLB to improperly garner evidence against Mr. Rodriguez, which ultimately resulted in the Arbitration Award upholding most of the baseless suspension.

### C.    The Damaging Public Remarks Made by MLBPA

60.    Michael Weiner ("Mr. Weiner") was the Executive Director of MLBPA. Mr. Weiner joined MLBPA in September 1988, became its General Counsel in 2004, and was named its Executive Director in December 2009. As MLBPA's Executive Director, Mr. Weiner was the chief officer and representative of the labor organization representing Mr. Rodriguez and the other MLBPA collective bargaining unit members.

61.     On July 16, 2013, MLB's 2013 All-Star Game took place in New York.  As a
global audience focused its attention on professional baseball and the "Mid-Summer Classic,"
Mr. Weiner participated in a press conference before scores of reporters for national and, indeed,
international media outlets.  During that press conference, Mr. Weiner commented on MLB's
investigation of the Biogenesis matter and, by implication, of Mr. Rodriguez.  In doing so,
however, Mr. Weiner disregarded and violated the confidentiality provisions of the JDA.  The
following day, Mr. Weiner was quoted in a *New York Daily News* article entitled "Union: Drug
Bans Might Wait Till 2014," as saying:

> Our players that deserve suspensions we will try to cope with their suspensions.
> Our players that don't deserve suspensions we will try to argue that they don't
> deserve suspensions.

62.     One day later, on July 18, 2013, the *New York Daily News* published an article
entitled, "Not So Fast, A-Rod: Weiner Warns Drug Cheats Could Face Major Road Block," in
which Mr. Weiner was quoted saying:

> I can tell you, if we have a case where there really is overwhelming evidence, that
> a player committed a violation of the program, our fight is going to be that they
> make a deal…We're not interested in having players with overwhelming evidence
> that they violated the (drug) program out there.  Most of the players aren't
> interested in that.  We'd like to have a clean program.

63.     Those July comments seemed to "set the stage" for what was to come in August.
Indeed, on August 6, 2013, Mr. Weiner appeared on Chris Russo's radio show on XM Radio to
discuss his views of MLB's investigation of Mr. Rodriguez and others.  When Mr. Weiner was
asked whether he would advise Mr. Rodriguez to accept an offer by MLB to settle its
investigation in exchange for a suspension, Mr. Weiner shockingly disclosed the advice that he
had offered Mr. Rodriguez (of course without Mr. Rodriguez's consent):

I don't want to give a number [of games] *but there was a number that I gave A-Rod and advised him to take it*, and he was never given that number.

64.     Mr. Weiner then was asked: "Wouldn't that be an admission that A-Rod did steroids then if you gave him a number that would have been acceptable?" In response, Mr. Weiner stated, in relevant part:

> As to whether [Mr. Rodriguez] used or not, *based on the evidence we saw, we made a recommendation [to accept a suspension]...*"

65.     By letter dated August 7, 2013, Mr. Rodriguez (through counsel) voiced his "extreme shock and disappointment" in Mr. Weiner's comments to MLBPA. MLBPA responded with a self-serving letter stating nothing more than Mr. Weiner's remarks in no way prejudiced Mr. Rodriguez.

66.     Moreover, Mr. Weiner's statements were clearly inconsistent with MLBPA's duty to fairly and ardently represent Mr. Rodriguez, particularly because Mr. Weiner was the Executive Director of the MLBPA. Indeed, they reflect a prejudgment by MLBPA concerning Mr. Rodriguez's guilt that irreparably corrupted the arbitration process, particularly when made by his union's then highest ranking official.

67.     Moreover, Mr. Weiner's conduct contravenes his own statements regarding the integrity of the Grievance process provided for by the Agreements. In a press release dated July 12, 2013, Mr. Weiner stated that "[r]epeated leaks threaten to harm the integrity [of the JDA]" and "call into question the required level of confidentiality needed to operate a successful prevention program." The statement went on to note that baseball's testing program "guarantees each player due process rights accompanied by strict confidentiality provisions." Mr. Weiner's

statements concerning Mr. Rodriguez, therefore, offend not only the MLBPA's contractual and legal obligations but its own, previously stated guidelines as well.

**D.**     **Additional Violations of the Duty of Fair Representation by MLBPA**

68.     In addition to disparaging Mr. Rodriguez and idly standing by as MLB violated the Agreements, MLBPA breached its duty of fair representation by failing to allow Mr. Rodriguez to appoint an arbitrator to the Arbitration Panel.

69.     The Agreements provide that the parties may elect to have a Grievance decided by a three-person arbitration panel consisting of a neutral and one arbitrator each as appointed by MLB and MLBPA. In light of MLBPA's failure to adequately represent Mr. Rodriguez's interests – and particularly in light of Mr. Weiner's public comment proclaiming MLBPA's pre-judgment of Mr. Rodriguez's violation of the Agreements – Mr. Rodriguez requested that MLBPA permit him, and not MLBPA, to select the MLBPA-appointed arbitrator.

70.     Despite the lack of any compelling reason to deny Mr. Rodriguez's request, but apparently fearful that a true party arbitrator would "take on" MLB forcefully, MLBPA arbitrarily refused to allow Mr. Rodriguez to select an arbitrator for the Arbitration Panel. While the arbitrator appointed by MLB at all times advocated on behalf of MLB's interests and MLB's interests alone, the MLBPA-appointed arbitrator consistently advised Mr. Rodriguez that he represented the interests of the union as a whole, and not Mr. Rodriguez individually, and thus had to act accordingly. Thus, the capricious decision by MLBPA to prevent Mr. Rodriguez from selecting an arbitrator further undermined the fairness of the Grievance arbitration.

71.     Moreover, MLBPA's representation of Mr. Rodriguez at the Hearing was perfunctory at best.  MLBPA continually sat on its hand throughout the Hearing all while, among other things, dubious evidence was presented to the Arbitration panel, confidential information regarding the arbitration was leaked to the media, and the Arbitrator manifestly disregarded the law.  Such flagrant violations of the duty of fair representation crippled Mr. Rodriguez's ability to have the discipline adjudicated in a fair and impartial manner.

72.     Finally, on the same day on which Arbitrator Horowitz issued the Arbitration Award, MLBPA released a statement contemporaneously with Arbitrator Horowitz's release of his decision, and without consultation with Mr. Rodriguez or his counsel.  In its statement, MLBPA noted that: "The MLBPA strongly disagrees with the award issued today in the Grievance of Alex Rodriguez, even despite the Arbitration Panel's decision to reduce the duration of Mr. Rodriguez's unprecedented 211-game suspension.  We recognize that a final and binding decision has been reached, however, and we respect the collectively-bargained arbitration process which led to the decision..."

73.     Thus, despite MLBPA's disagreement with the discipline imposed upon Mr. Rodriguez, it has refused to seek an overturn of the Arbitration Award.  Such an approach – where the rights of Mr. Rodriguez are trampled upon while MLBPA passively looks on – is consistent with MLBPA's frequent violations of the duty of fair representation that have pervaded Mr. Rodriguez's Grievance.

### III.   MLB'S BREACH OF THE COLLECTIVELY BARGAINED AGREEMENTS

74.   In addition to the acts of misconduct alleged herein, MLB has also violated the Article XII of the BA between MLB and MLBPA by baselessly issuing a Notice of Discipline and suspending Mr. Rodriguez for 211 games without just cause.

75.   The BA provides that "[t]he Parties recognize that a Player may be subjected to disciplinary action for just cause by…the Commissioner.  Therefore, in Grievances regarding discipline, the issue to be resolved shall be whether there has been just cause for the penalty imposed. If discipline imposed upon a Player is determined to be improper by reason of a final decision under this Grievance Procedure, the Player shall promptly be made whole."

76.   With respect to Mr. Rodriguez, MLB violated the BA by imposing discipline upon Mr. Rodriguez without just cause and garnering the Arbitration Award upholding the bulk of the suspension.

77.   Such breach of the BA has directly and proximately caused injury to Mr. Rodriguez by resulting in a flawed Arbitration Award which denied in large part Mr. Rodriguez's Grievance.

### IV.   THE ARBITRATION HEARING, DECISION, AND GROUNDS FOR VACATUR OF THE DECISION

78.   Throughout the entire Grievance process, Arbitrator Horowitz acted with manifest disregard for well-settled principles of law and demonstrated evident partiality towards MLB. He also refused to hear evidence pertinent and material to the Grievance process and engaged in other misconduct which prejudiced Mr. Rodriguez's right to a fair and impartial arbitration. Further, the Arbitration Award does not draw its essence from the Agreements.

A.    **The Award Does Not Draw Its Essence From the JDA or BA**

79.    In the Arbitration Award, Arbitrator Horowitz upheld, in part, MLB's discipline of Mr. Rodriguez, suspending him for 162 games (the entirety of the 2014 MLB season) as well as the 2014 postseason.  The Arbitrator's decision to impose a 162 game suspension amounted to his own brand of industrial justice as the suspension contravenes the progressive, disciplinary framework set forth in the JDA.

80.    Section 7(A) of the JDA provides in relevant part:

A Player who tests positive for a Performance Enhancing Substance, or otherwise violates the program through the use or possession of a Performance Enhancing Substance, will be subject to the discipline set forth below.

    1.    First violation: 50-game suspension;

    2.    Second violation: 100-game suspension;

    3.    Third violation: Permanent suspension [with possible, discretionary reinstatement by the Commissioner after two years].

81.    During the time frame set forth in the Notice of Discipline – 2010 to 2012 – Mr. Rodriguez was subjected to eleven drug tests pursuant to what MLB claims is the "toughest, most comprehensive" drug program in sports.  Mr. Rodriguez passed each and every test he underwent.  The Arbitration Award notes that Mr. Rodriguez has never been suspended for a violation of the JDA, and had passed eleven drug tests during the timeframe at issue.

82.    After baselessly finding that MLB's suspension was justified, Arbitrator Horowitz should have considered Mr. Rodriguez to be a first-time offender under the JDA and thus subject to a 50 game suspension.  Instead, Arbitrator Horowitz justified the unprecedented discipline imposed upon Mr. Rodriguez by coupling together multiple alleged violations of the JDA and citing the continuing nature of the alleged violations.  The JDA and BA, however, do not

- 28 -

contemplate such an approach to disciplining MLB players as doing so eviscerates the progressive discipline set forth in Section 7(A) of the JDA.

83.     Accordingly, the Arbitrator ignored the clear, disciplinary language of the JDA and suspended Mr. Rodriguez for an entire season and postseason, manifesting infidelity to his obligation to ground the Arbitration Award in the collectively bargained agreements between MLBPA and MLB.  Accordingly, the Arbitration Award is not legitimate as it does not draw its essence from the JDA or BA.

84.     Further, when discussing the appropriateness of Mr. Rodriguez's suspension, the Arbitrator relied upon the suspension of an MLB player that was found to have violated the JDA on multiple occasions, but deliberately ignored the suspensions of other MLB players that, like Mr. Rodriguez, had never before violated the JDA.  The Arbitrator's reliance on inapposite precedent further displays the Arbitration Award's departure from the essence of the collectively bargained agreements.

85.     In addition to being in contravention of the JDA, the Arbitration Award, in at least one respect, exceeds the scope of the Notice of the Discipline which suspended Mr. Rodriguez "for the remainder of the 2013 season (including postseason) and the entire 2014 regular season."  By its terms, the Notice of Discipline did not suspend Mr. Rodriguez for the 2014 post-season, a penalty Arbitrator Horowitz saw fit to impose on his own accord and which further demonstrates the Arbitrator's partiality toward MLB.

- 29 -

**B.     The Arbitrator's Rulings on Testimonial Evidence**
**Prejudiced Mr. Rodriguez and Manifestly Disregarded the Law**

86.     As one of the most egregious examples of his numerous erroneous rulings during

the course of the arbitration, on November 20, 2013, Arbitrator Horowitz ruled that Mr.

Rodriguez would not be permitted to call Commissioner Selig – the man responsible for issuing

Mr. Rodriguez's unprecedented 211 game suspension – as a witness at the hearing, meaning that

Mr. Rodriguez would have to engage in a Grievance proceeding without having the right to

cross-examine his accuser.  Mr. Rodriguez would never get an opportunity to question the man

responsible for his unprecedented 211 game suspension on why the suspension was imposed,

what facts Commissioner Selig relied on when imposing the suspension, or why the suspension

grossly exceeded those given to other MLB players accused of taking banned substances.

87.     Incredibly, while Mr. Selig did not come to the arbitration and testify under oath

and subject himself to cross-examination, he saw no problem in sitting down with *60 Minutes* to

discuss the reasons for Mr. Rodriguez's suspension.  This, too, makes a mockery of the

arbitration procedure and the confidentiality supposedly attendant to it.

88.     In place of Commissioner Selig, Arbitrator Horowitz permitted Robert Manfred,

Chief Operating Officer of MLB and a member of the Arbitration Panel deciding Mr.

Rodriguez's Grievance, to testify as to the decision-making process underlying the Notice of

Discipline issued to Mr. Rodriguez.  Mr. Manfred, however, testified that he merely made

"recommendations" to Commissioner Selig and that the ultimate authority rested with and was

exercised by Commissioner Selig alone.  As such, the ruling by Arbitrator Horowitz deprived

Mr. Rodriguez of the ability to test a critical component of MLB's case.

- 30 -

89.     Moreover, Arbitrator Horowitz's ruling placed the supposed trier of fact in the position of offering testimony on material factual issues; stripping the Hearing of any modicum of due process and undermining the impartiality of the Arbitration Panel.

90.     Furthermore, Arbitrator Horowitz ruled that Mr. Rodriguez could not offer evidence concerning Bosch's treatment of other MLB players with non-banned nutritional supplements, testimony that would have corroborated Mr. Rodriguez's argument that he merely sought nutritional guidance from Mr. Bosch and was treated with non-banned nutritional supplements such as amino acids, vitamins, Bioefa, alpha lipoic acid, cider vinegar, ginseng and fish oil.

91.     To compound the situation, when Arbitrator Horowitz did permit testimony, he did so in a way which ensured that such testimony would be selective and one-sided.

92.     For example, Arbitrator Horowitz permitted Bosch to testify in an unfettered manner against Mr. Rodriguez on direct examination by MLB, while allowing Bosch to avoid answering material and relevant questions posed by Mr. Rodriguez on cross-examination under the guise of the Fifth Amendment.

93.     Specifically, Bosch's decision to freely answer questions on direct examination waived his Fifth Amendment protections with regard to the subject matter of those questions. Because Bosch asserted his Fifth Amendment privilege during cross-examination as to questions he willingly answered during direct examination, counsel for Mr. Rodriguez did not have the opportunity to question him or challenge the veracity of his direct examination statements. Bosch's repeated assertion of the Fifth Amendment – utilized because of his concern over criminal prosecution – caused the Arbitration Panel to receive a distorted view of the truth.  As a

result, the Arbitration panel was unable to develop a complete factual record on subject matters

which Bosch addressed on direct examination.

94.     For example, during two days of cross-examination, Bosch pled the Fifth

Amendment in response to questions posed by Mr. Rodriguez's counsel regarding the following

material issues:

- Bosch's illegal possession of banned and illegal substances;

- Bosch's use of forged prescription slips;

- Bosch's unlicensed practice of medicine;

- Bosch's receipt of monies from the sale of banned and illegal substances;

- The source of the banned and illegal substances Bosch provided to clients;  and

- The names and inscriptions, specifically the letters "H.S." (referring to high school athletes whom he treated with steroids), appearing in Bosch's Notebooks.

95.     Bosch refused to answer questions pertaining to the above-referenced topics on

cross examination, despite having willingly answered questions on the same subject matter when

posed by counsel for MLB.  Bosch's willingness to testify on behalf of MLB on the subjects

constituted a waiver of his Fifth Amendment privilege, yet Arbitrator Horowitz still permitted

Bosch's selective testimony to stand.

96.     By permitting Bosch to assert his Fifth Amendment privilege in response to

questions on the same subject matter on cross-examination, Arbitrator Horowitz acted with

manifest disregard for well-settled legal principals and excluded evidence pertinent and material

to the Grievance process.  Since Bosch was unable to provide a complete factual record on

subject matters which he addressed on direct examination, his direct testimony should have been stricken from the record and disregarded by the Arbitration panel.

> **C.**    **The Arbitrator Prevented Mr.**
> **Rodriguez's Expert From Analyzing Key Evidence**

97.    Much like his one-sided rulings regarding Bosch's invocation of the Fifth Amendment, Arbitrator Horowitz allowed the same practice to ensue with respect to expert analysis of Bosch's BlackBerry devices.

98.    Throughout the Hearing – and even through pre-Hearing leaks to the media – MLB trumpeted the strength of its "evidence" and specifically BlackBerry Messenger messages ("BBM") supposedly between Bosch and Mr. Rodriguez.  MLB was permitted to have two separate experts analyze the Bosch BlackBerries for purposes of adducing what MLB considered to be key evidence against Mr. Rodriguez.  Despite MLB's reliance upon this evidence to issue the Notice of Discipline and suspend Mr. Rodriguez, Mr. Rodriguez was given no opportunity to conduct a review of the Bosch BlackBerries.

99.    Specifically, Arbitrator Horowitz arbitrarily denied Mr. Rodriguez's request, made by letter dated September 19, 2013, to have his experts examine Bosch's BlackBerry devices, even though such devices had previously been within the exclusive possession of MLB. Rather than permit both sides to have access to such devices, in rulings dated September 24, 2013 and September 26, 2013, Arbitrator Horowitz declined Mr. Rodriguez's request and instead directed the parties to consider the use of a neutral expert (again ignoring the fact that MLB had two of its own experts analyze the devices).

100.    In fact, when it became clear that Arbitrator Horowitz would not grant Mr. Rodriguez's experts access to the devices, Arbitrator Horowitz even denied Mr. Rodriguez's supplemental requests to require MLB's BlackBerry expert to: (i) provide Mr. Rodriguez's counsel with an expert report detailing his work and his findings; or (ii) be subject to a deposition prior to the time he offered testimony before the Panel. As a result, while MLB's experts were afforded an opportunity to perform whatever tests or searches of the devices he deemed necessary months previously, Mr. Rodriguez's expert was never given access to the devices.

101.    Accordingly, Mr. Rodriguez's expert was not permitted to conduct his own forensic examination of the BlackBerry devices to determine whether the BBMs had been subject to manipulation, and was not permitted to search the devices for potentially exculpatory evidence. Without an independent forensic examination, Mr. Rodriguez was denied an opportunity to test the validity of the BBMs – a key piece of evidence relied upon by Arbitrator Horowitz. Indeed, when Mr. Rodriguez's expert did review the summary report prepared by MLB's expert, such report was rife with material discrepancies and other troubling inconsistencies which alone call into question the validity of the BBM evidence presented by MLB.

102.    Arbitrator Horowitz's failure to permit Mr. Rodriguez to conduct an expert analysis of key evidence presented by MLB – essentially a refusal to entertain evidence which would have been material to the Hearing – was in blatant disregard of the law and displays the Arbitrator's partiality toward MLB.

**D.     The Arbitrator Admitted Unreliable, Inauthentic Evidence at the Arbitration**

103.    Arbitrator Horowitz demonstrated a manifest disregard for the law by admitting into the arbitration record and relying upon unreliable evidence, wholly unauthenticated documents, and hearsay testimony.

104.    Arbitrator Horowitz consistently permitted hearsay testimony to be entered throughout the arbitration.  For example, the testimony of MLB's star witness, Bosch, was rife with hearsay – even of the third, fourth and fifth party varieties – yet it was admitted into evidence as direct evidence in support of MLB's heavy burden of proof in the hearing (namely clear and convincing evidence), without any further testimony from other witnesses or supporting documents to corroborate its veracity.

105.    As just one example, Arbitrator Horowitz permitted Bosch to testify that he was allegedly told by an associate of Mr. Rodriguez that Mr. Rodriguez had stated that he was interested in meeting with Bosch and becoming a Bosch client.  The record created by the Arbitrator's manifest disregard of the law is rife with similar examples of indirect, attenuated and otherwise specious evidence.

106.    Moreover, Arbitrator Horowitz improperly allowed MLB to admit into evidence entirely unreliable documentary evidence, and then relied upon such documents in issuing the Arbitration Award.  These documents, however, were previously stolen on multiple occasions, were not original documents, bore no indicia of reliability and were illegible, out of order, and contained multiple inconsistencies.  Further, Bosch – the witness provided by MLB to authenticate the documents – reviewed only a small portion of the documents, admitted that certain of the documents were not in his handwriting and otherwise failed to offer a proper basis for admission of the documents.

- 35 -

107.    Arbitrator Horowitz's reliance upon and admission of inauthentic and unreliable evidence constitutes a manifest disregard of the law.

**E.    Arbitrator Horowitz Permitted Leaks
        of Confidential Information Throughout the Hearing**

108.    The Agreements contain confidentiality provisions mandating that the confidentiality of Mr. Rodriguez's Hearing be preserved at all times.  Arbitrator Horowitz utterly failed to maintain the confidentiality of the Hearing and such persistent leaking of confidential information by MLB, and even the MLB-appointed arbitrator, tainted the arbitration and the resulting Arbitration Award.

109.    Throughout the course of the Hearing, confidential information was consistently provided to the media by MLB.  For example, on October 16, 2013, the *New York Daily News* reported that during his testimony in the arbitration sessions, Bosch "authenticated a pile of documents and electronic communications" that MLB says reflect the League's conclusion that Rodriguez acquired banned substances from Bosch.  Given that the report was critical of Mr. Rodriguez, such information could only have come from MLB.

110.    On October 19, 2013, Mr. Manfred – the MLB-appointed arbitrator – violated the confidentiality attaching to his own testimony by voluntarily discussing it with the media. Specifically, Mr. Manfred stated: "What I testified to was that our sole obligation was to determine whether players had violated the Basic Agreement and the Joint Drug Agreement and the enforcement of laws, baseball has been a leader through its support of the Taylor Hooton Foundation in preventing steroid abuse by young people, and we are proud of our track record in

- 36 -

that regard."[21]  Mr. Manfred's breach of the confidentiality provisions was clear as his public

statements selectively described testimony that he offered at the Hearing.

111.    Moreover, on October 31, 2013, Mr. Manfred made disparaging remarks

regarding Mr. Rodriguez that also conveyed Mr. Manfred's view of the evidence presented by

MLB, as well as his opinion as to the weight of the evidence that had been put forth in the

Hearing: "This latest, sad chapter in Mr. Rodriguez's tarnished career is yet another example of

this player trying to avoid taking responsibility for his poor choices…Given the disappointing

acts that Mr. Rodriguez has repeatedly made throughout his career, his expressed concern for

young people rings very hollow.  Mr. Rodriguez's use of PEDs was longer and more pervasive

than any other player, and when this process is complete, the facts will prove it is Mr. Rodriguez

and his representatives who have engaged in ongoing, gross misconduct."[22]

112.    Mr. Rodriguez's counsel brought these flagrant violations to the attention of

Arbitrator Horowitz in a letter dated November 4, 2013.  Rather than accede to Mr. Rodriguez's

request for MLB and Mr. Manfred to honor the confidentiality owed to Mr. Rodriguez under the

Agreements, Arbitrator Horowitz stood by and continued to permit MLB to trample on the

confidentiality that should have been afforded to Mr. Rodriguez and the Hearing.

113.    Arbitrator Horowitz permitted these rampant breaches by MLB of the

confidentiality provisions of the Agreements to continue unchecked and unabated.  In doing so,

Arbitrator Horowitz – a member of the National Academy of Arbitrators – not only prejudiced

---

[21]    *AP: Clinic sales to minors not MLB concern,* USA Today, (October 19, 2013), *available at*
http://www.usatoday.com/story/sports/mlb/2013/10/19/ap-clinic-sales-to-minors-not-mlb-concern/3078525/

[22]    Andrew Marchand, *Rob Manfred Blasts Alex Rodriguez,* ESPN, (October 31, 2013),  *available at*
http://espn.go.com/espn/print?id=9909186&type=story

Mr. Rodriguez but also violated the *Code of Professional Responsibility for Arbitrators of Labor-Managements Disputes* (1972, amended 2007) (the "Code"). Section 2(c)(1) of the Code provides that "[a]ll significant aspects of an arbitration proceeding must be treated by the arbitrator as confidential unless this requirement is waived by both parties or disclosure is required or permitted by law."

114.    During the Hearing, Arbitrator Horowitz permitted another Panel member to make public statements that conveyed confidential information regarding the arbitration and otherwise failed to prevent MLB from breaching the confidentiality provisions of the Agreements. Such failure clearly violates the Arbitrator's professional responsibility obligations and served to taint the arbitration and resulting Arbitration Award. Indeed, in the Arbitration Award, Arbitrator Horowitz paid lip service to confidentiality breaches, but failed to take action against MLB for its clear breaches.

115.    The disclosure of confidential information by MLB and disparagement of Mr. Rodriguez – which went unchecked by the Arbitrator – evidences Arbitrator Horowitz's partiality towards MLB and prejudiced Mr. Rodriguez.

F.      **Arbitrator Horowitz is Incentivized to Rule in MLB's Favor**

116.    Arbitrator Horowitz's manifest disregard for the law and refusal to hear all evidence pertaining to this case is not surprising in light of his partiality to MLB.

117.    Under the Article XI(A)(9) of the BA, both MLB and MLBPA are empowered to terminate the impartial arbitrator appointed to oversee the Grievance process.

118.    Arbitrator Horowitz has been characterized as "somewhere between 'a casual fan and a junkie'" when it comes to baseball.[23]  Beyond his love of baseball, the role of the independent arbitrator for MLB/MLBPA Grievance proceedings is known as "one of the higher profile assignments in the arbitration profession."[24] As such, Arbitrator Horowitz has a deep personal interest in maintaining his position as the arbitrator of all MLB/MLBPA Grievance arbitrations.

119.    Arbitrator Horowitz has an incentive to keep MLB happy with his decisions as MLB terminated his predecessor, Shayum Das.  Arbitrator Das served as the MLB/MLBPA independent arbitrator for thirteen years but was terminated by MLB after he overturned the suspension of Ryan Braun, citing an unreliable chain of custody, but outraging league officials.[25] Das's firing sent a clear signal to future arbitrators that job security is contingent upon favorable rulings for MLB.  MLBPA, however, upon information and belief, has never terminated an arbitrator.  Accordingly, Arbitrator Horowitz has personal incentives to maintain his position as the neutral arbitrator for all MLB/MLBPA arbitrations by doing MLB's bidding.

120.    This incentive is highlighted by the fact that the original suspension imposed by MLB would have kept Mr. Rodriguez off the field until the end of the 2014 season, which, not coincidentally, coincides with Commissioner Selig's retirement.

---

[23]    Steve Eder, *Arbitrator Becomes a Baseball Power*, N.Y. TIMES, (July 26, 2013), *available at* http://www.nytimes.com/2013/07/27/sports/baseball/a-new-name-in-baseballs-investigation-the-arbitrators.html.

[24]    *Id.*

[25]    Michael O'Keefe and Christian Red, *Major League Baseball fires arbitrator who ruled for Milwaukee Brewers' Ryan Braun*, N.Y. DAILY NEWS, (May 14, 2012), *available at* http://www.nydailynews.com/sports/baseball/major-league-baseball-fires-arbitrator-ruled-milwaukee-brrwers-ryan-braun-article-1.1078242.

121.   Similarly, at all times when MLB discussed a potential settlement of the Grievance with Mr. Rodriguez, it insisted upon a 162 game suspension.  Lo and behold, this is the exact same suspension that Arbitrator Horowitz decided to uphold on January 11, 2014, fulfilling MLB's dual goals of "getting" Mr. Rodriguez for 162 games and keeping him off the field until Commissioner Selig retires.

## CLAIMS

### Count One – Breach of the Duty of Fair Representation by MLBPA

122.   Plaintiff restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

123.   By virtue of the foregoing facts, MLBPA has arbitrarily, discriminatorily, and/or in bad faith, breached its duty of fair representation to Mr. Rodriguez.

124.   As a result of MLBPA's wrongdoing, Mr. Rodriguez has been injured, the arbitration process has been seriously undermined, and the Arbitration Award must be vacated.

### Count Two – Breach of the Collective Bargaining Agreements by MLB

125.   Plaintiff restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

126.   By virtue of the foregoing facts, MLB violated the Labor Management Relations Act by breaching the collective bargaining agreements between it and MLBPA when it disciplined and suspended Mr. Rodriguez without just cause.

127.    By virtue of said breach, Mr. Rodriguez has been injured, and the Arbitration Award must be vacated.

### Count Three – Vacatur of the Arbitration Award

128.    Plaintiff restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

129.    By virtue of the foregoing facts, the Arbitrator demonstrated partiality, refused to hear evidence pertinent and material to the controversy, engaged in misbehavior by which the rights of Plaintiff have been prejudiced, manifestly disregarded the law and issued an Arbitration Award that does not draw its essence from the collectively bargained agreements.

130.    By virtue of such violations, Plaintiff has been injured, and vacatur of the Arbitration Award is proper.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

A. Finding that Defendant MLBPA has breach its duty of fair representation to Plaintiff;

B. Finding that Defendant MLB has breached the collectively bargained agreements;

C. Vacating the Arbitration Award; and

D.  Entering such other and further relief as the Court deems just, proper and equitable.

**Dated**: January 13, 2014
New York, New York

**REED SMITH LLP**

By: _____
James C. McCarroll, Esq.
Jordan W. Siev, Esq.
Casey D. Laffey, Esq.
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

-and-

**TACOPINA SEIGEL & TURANO, P.C.**
By: Joseph Tacopina, Esq.
275 Madison Avenue
New York, New York 10016
Tel: (212) 227-8877

*Attorneys for Plaintiff*
*Alexander Emmanuel Rodriguez*