CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

BEFORE THE MAJOR LEAGUE BASEBALL ARBITRATION PANEL

| | | |
|---|---|---|
| In the Matter of Arbitration | ) | |
| | ) | |
| between: | ) | Panel Decision No. 131 |
| | ) | |
| MAJOR LEAGUE BASEBALL PLAYERS | ) | |
| ASSOCIATION | ) | |
| | ) | Grievance No. 2013-02 |
| and | ) | (Alexander Rodriguez) |
| | ) | |
| OFFICE OF THE COMMISSIONER OF | ) | |
| BASEBALL | ) | |
| | ) | |
| | ) | |

Arbitration Panel:    David M. Prouty, Esq., Players Association Member
                      Robert D. Manfred, Jr., Esq., Office of the Commissioner
                      Member
                      Fredric R. Horowitz, Esq., Panel Chair

Appearances:

    Players Association ("MLBPA"):

                      Ian M. Penny, Esq.
                      Matthew R. Nussbaum, Esq.
                      Robert A. Lenaghan, Esq.
                      Robert M. Guerra, Esq.

    Office of the Commissioner ("MLB"):

                      Daniel R. Halem, Esq.
                      Paul V. Mifsud, Jr., Esq.
                      Jonathan D. Coyles, Esq.
                      Steven P. Gonzalez, Esq.
                      Patrick J. Houlihan, Esq.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

<div style="margin-left: 2em">

PROSKAUER ROSE LLP
Howard L. Ganz, Esq.
Neil H. Abramson, Esq.
Adam L. Lupion, Esq.
Joshua Fox, Esq.

</div>

Alexander Rodriguez ("Rodriguez"):

<div style="margin-left: 2em">

GORDON & REES LLP
Wm. David Cornwell, Sr. Esq.
Benjamin Levine, Esq.

REED SMITH LLP
Jordan W. Siev, Esq.
James C. McCarroll, Esq.
Christopher P. Hoffman, Esq.

TACOPINA SEIGEL & TURANO PC
Joseph Tacopina, Esq.
Dina Nesheiwat, Esq.
Matthew G. DeOreo, Esq.

LAW OFFICES OF HOWARD L. JACOBS
Howard L. Jacobs, Esq.

</div>

| | |
|---|---|
| Hearings Held: | September 4 and 30, 2013<br>October 1-4 and 16-18, 2013<br>November 18-21, 2013<br>New York, New York |
| Executive Session: | December 20, 2013 |

## INTRODUCTION

This arbitration arises under the collective bargaining agreement ("Basic Agreement" or "BA") between the 30 Major League Clubs ("Clubs") and the Major League Baseball Players Association ("MLBPA") effective December 12, 2011 [JX 1] and Major League Baseball's Joint Drug Prevention and Treatment Program ("JDA") established by agreement of the Office of the Commissioner of Baseball ("MLB") and the MLBPA effective December 12, 2011 [JX 2].  MLB

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

and the MLBPA concur that the grievance at issue has been processed pursuant to the dispute resolution procedures in the BA and JDA and is properly in arbitration before this Arbitration Panel.[1]

## BACKGROUND

Alex Rodriguez ("Rodriguez") is a 38 year-old infielder with the New York Yankees. Prior to the imposed suspension at issue, Rodriguez had not been suspended by MLB for a violation of the JDA.

This case arose out of the activities of Anthony Bosch, who provided hormone replacement and nutritional medicine services to a variety of clients at his "anti-aging" clinic in South Florida. The clinic operated under a variety of names, including Biokem and Biogenesis. His parents are both physicians. In 2007, he received a doctor of medicine degree from Central America Health Sciences University School of Medicine in Belize. Bosch was never licensed to practice medicine in the United States, but he ran a nutrition program for endocrinologists in El Paso, Texas and later ran a hormone replacement, anti-aging, and nutritional program for a group of urologists in Florida. At Biogenesis, Bosch aspired to build a nutritional consulting practice with an emphasis on clinical nutrition, research, education, and product development.

One of Bosch's clients was Jorge "Oggi" Velazquez. In 2009 or early 2010, Velazquez introduced Bosch to his friend Yuri Sucart, who is a cousin of Rodriguez. Bosch treated Sucart for excessive weight and related health issues. At some point Sucart informed Bosch that he worked for Rodriguez, who Sucart often referred to as "primo" (cousin) or "cacique" (chief). Among the supplements Bosch provided to Sucart were lozenges called troches containing testosterone obtained from compounding pharmacies. Testosterone is an anabolic steroid and one of the Performance Enhancing Substances ("PES") that Major League Baseball Players are prohibited from possessing and/or using by the JDA. As used herein, PES refers to any substance banned under Section 2.B of the JDA.

---

[1]  Article XI(9) of the Basic Agreement provides for arbitration by a tripartite panel composed of an impartial arbitrator and two party arbitrators, one appointed by the Players Association and one appointed by MLB. The impartial arbitrator is the Panel Chairman, and is the author of this opinion. The Players Association appointed David Prouty, its General Counsel, to serve as its party-arbitrator, and MLB appointed Robert Manfred, its Chief Operating Officer, to serve as its party-arbitrator. Under the parties' longstanding past practice, party-arbitrators serve as advocates for the positions asserted in the arbitration by the parties they represent, and may testify as witnesses if called by either party.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

In early 2010, Sucart told Bosch that use of a troche had given him an unbelievable sense of energy recovery.  Sucart added that Rodriguez had also used one and loved it because of its explosive effect.  Sucart inquired if a troche would produce a positive drug test, and Bosch replied not likely because they contained a low percentage of testosterone and were fast-acting.  Sucart also inquired whether Bosch recommended human growth hormone ("hGH"), another PES, for use by professional athletes.  At some point, Velazquez told Bosch that Rodriguez wanted to meet him to discuss potentially becoming a client.

In late July 2010, Velazquez arranged for Bosch to meet Rodriguez with Velazquez and Sucart in Rodriguez's hotel room after a Yankees game against the Rays in Tampa.  Velazquez described Bosch as the best at what he does and said Bosch could provide Rodriguez with everything he needed.  Rodriguez inquired about another Bosch client, a prominent Major League Player who Bosch had supplied with various PES and who ultimately tested positive under the JDA.  Bosch explained that the Player in question failed to follow his instructions and received an intramuscular injection by someone else at the wrong time.  Bosch told Rodriguez that it would be nearly impossible to test positive for any PES he would supply with proper diagnostic blood testing, dosing, and timing of administration.  Bosch described in detail the testosterone creams and other substances including other PES he would be recommending for use by Rodriguez.

In early August 2010, Bosch traveled to New York and met Rodriguez at his Manhattan apartment with Velazquez and Sucart present.  Bosch insisted on drawing blood from Rodriguez so that he could create an appropriate protocol.  Bosch drew the blood with equipment he brought and then returned to Miami with the sample.  Before leaving New York, Bosch told Velazquez he required a down payment of $10,000 to $12,000.  Bosch was assured by Velazquez that he would get the money from Rodriguez to give to Bosch on his next visit.  Based on his analysis of the lab report of Rodriguez's blood sample, a consultation with a urologist, and his conversations with Sucart, who said he had taken care of Rodriguez's medical and health care issues, Bosch designed the following protocol for Rodriguez [MLB 7]:

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

PHASE 1 (Aug '10)

*Subcutaneous*

| Morning | hGH | 1.5 [units] | 6 days "on" | 1 day "off" |
|---|---|---|---|---|
| Evening | GHRP 2/6 | 1.5 | 6 days "on" | 1 day "off" |
| Monday (Noon) | CJC 1295 | 1.3 | | |
| Friday (Noon) | CJC | 1.3 | | |

*Intramuscular*

| Fat Burning/Energy Cocktail | 1.5 ml | Monday |
|---|---|---|
| Amino Acid Therapy Cocktail | 1.5 ml | Friday |

*Transdermal*

| Testosterone Cream | As directed | Daily (evening) |
|---|---|---|
| L-Glutathione Cream | As directed | Daily (morning) |

(or a combination of the two above creams applied in the evening)

*Sublingual*

| Melatonin | 3 mg | Evening |
|---|---|---|
| Testosterone Troche | 1-3mg | Prior to game as needed |

*Oral*

| Vitamin C | Daily/Orthomolecular Dosages |
|---|---|
| Omega 3,6,9 | Daily/Orthomolecular Dosages |
| DHEA [dehydroepiandrosterone] | Daily/Orthomolecular Dosages |
| Pregnenolone | Daily/Take as directed |
| Multi-Vitamin/Zinc | Daily/Take as directed |
| Clomiphene (10 day therapy) | Daily/Take as directed |

*Diet*

| Sports Nutrition & Performance Diet | Playing Days |
|---|---|
| Water Loss Diet | Non-Playing Days |

*Chelation*

Amino Acid
Free Radical
Mitochondrial Repair
Testosterone/Estrogen Balance

PHASE 2 (Sep '10)

After 30 days increase treatment to:

| Morning | hGH | 1.8 [units] |
|---|---|---|
| Evening | GHRP 2/6 | 1.8 |
| Tuesday (Noon) | CJC 1295 | 1.4 |
| Saturday (Noon) | CJC 1295 | 1.4 |

6 days "on"
6 days "off"

Continue treatment for 30 days

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

PHASE 3 (Oct '10)

After 30 days increase treatment to:

| Morning | IGF-1 | 1.1 [units] |
| Evening | hGH | 1.9 |

5 days "on"
2 days "off"

Continue treatment for 30 days

PHASE 4 (Nov '10)

After 30 days increase treatment to:

| Morning | hCG | 1.6 [units] |
| Evening | hGH | 1.6 |

5 days "on"
2 days "off"

Continue treatment for 30 days

Bosch returned to New York the following week to meet Rodriguez with Velazquez and Sucart in the same apartment. Bosch explained the entire protocol to Sucart and portions of the protocol to Rodriguez. Bosch gave Sucart pre-loaded syringes containing PES from the protocol for subcutaneous injection. Sucart took two of the syringes to Rodriguez in another room to administer as directed by Bosch. Velazquez gave Bosch $8,000-$10,000 in cash for payment stating the money was from Rodriguez. Thereafter, Bosch supplied Sucart with PES and other supplements contained in the protocol to administer to Rodriguez.

In 2011, Bosch met with Rodriguez at least four or five times in New York or Miami to draw blood and infuse him intravenously with substances that always included testosterone and hGH as well as CJC-1295 and GHRP 2/6 (growth hormone releasing peptides that MLB contends are banned under the catch-all provision of the JDA). Bosch made periodic adjustments to the protocol, which he fully explained to Rodriguez and Sucart. Bosch informed Rodriguez of each substance that he provided to him, and discussed the reason for including the substance in the protocol. One such adjustment was made after a visit with Rodriguez in New York [MLB 34]:

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

> Blood Draw Kit
> 4 Sub-Q [insulin] shots of IGF-1
> Order Activagen
> [Order] Creams:  L-Glut[athione]
>                  Test @ 10%
>                  Troches @ 19%
>                  Keto[profen]/Ibu[profen]
> 9 shots of CJC/GHRP @ .7 iv
> Cal[cium/mag[nesium]/zinc  x  1 AM/ 1 PM
> 6 shots of hGH @ 2.5 iv
> DHEA   PM  25-50 mg.
> Amino Acids  PRN daily
> Vit D$_3$  as directed
> Resveratrol  as directed

That year Bosch regularly supplied Rodriguez through Sucart with PES, including the testosterone troches and creams, IGF-1 (insulin growth factor), and hGH.[2]  For his services, Bosch was given monthly payments of $4,000-$6,000 in cash from Rodriguez through Velasquez.[3]

In late 2011, Rodriguez fired Sucart, so Bosch began supplying the PES and other supplements directly to Rodriguez.  In December 2011, Bosch recorded the following protocol for Rodriguez [MLB 33]:

> [Blue] Testosterone
>    Cream                    PM      4 clicks
> L-Glutathione               AM      4 clicks
> Troche                      Prior to workout
> M – W – F                   CJC and GHRP .7 AM/ .7 Noon/ .7 PM
> T – Th                      IGF-1   1.4 via iv
> MIC                         2 x per week
> AM Supplements:             DHEA
>                             Resveratrol
>                             Melatonin
>                             Glucosamine
>                             Alpha Lipoid acid
> Pink [Testosterone]
>    Cream                    PRN
> Ibuprofen/Ketoprofen
> Cream

Throughout the 2012 season, Rodriguez and Bosch communicated with each other directly by telephone, text messages, and BlackBerry messages ("BBMs") related to the doses and timing of administration of the PES and other supplements, as well as the payments for

---

[2]  The record reflects that Sucart and Bosch spoke over 400 times by telephone and exchanged 476 text messages in 2011 alone.
[3]  Records introduced into evidence show that A-Rod Corporation or Rodriguez made miscellaneous payments to Sucart in 2010 and 2011 totaling more than $160,000.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

Bosch's services.[4]   Bosch and Rodriguez exchanged over 500 BBMs between March and December 2012 based on the information that was recovered from Bosch's BlackBerry devices.  In addition to the BBM exchanges, the record reflects that Bosch and Rodriguez spoke on the telephone 53 times and exchanged 556 text messages in 2012.

    In 2012, with Sucart no longer involved, Bosch saw Rodriguez more frequently, and Bosch personally treated Rodriguez at least twice per month. Bosch continued in 2012 to provide Rodriguez with testosterone cream, testosterone troches, hGH, IGF-1 and peptides as part of his monthly protocols.  During the course of their relationship, in addition to providing Rodriguez with the infusions discussed above, Bosch personally injected Rodriguez with banned substances between four to six times, including injecting him with testosterone suspension.

    The BBMs include numerous references to substances banned by the JDA.  Bosch and Rodriguez used code names in the BBMs to refer to banned substances, including referring to banned substances as "food."  Once when Bosch sent a message telling Rodriguez that he was going to pick up Rodriguez's "meds," Rodriguez replied "Not meds dude.  Food."  The BBMs between Bosch and Rodriguez are replete with references to their code names for numerous banned substances, including the following: Gummies (troches containing testosterone); Pink Food or Pink Cream (a transdermal cream containing testosterone); Blue or PM Cream (a transdermal cream containing testosterone); Liquid Soup or Red Liquid (a melted or liquefied form of a troche containing testosterone); and Cojete or Rocket (a subcutaneous syringe containing, among other things, hGH and IGF-1).

    The BBMs also show that Bosch and Rodriguez discussed the possibility that Rodriguez would be tested under the JDA.  For example, Bosch asked Rodriguez in a BBM sent on April 2, 2012: "[D]o u think they are going to test?" A few days later, Bosch advised Rodriguez that "[i]f by any chance they make you piss, wait the longest you can and don't use the pink until after." When Rodriguez indicated he would not be required to "piss" until after the game was over (until around "11pmish") and asked whether he could use "[p]ink" before the game, Bosch

---

[4]  All of these BBM's were recovered from devices used by Bosch.  Rodriguez did not produce his BlackBerry or similar device, or the content of any BBMs contained on such devices, despite receiving omnibus information requests from MLB. Counsel for Rodriguez represented the Blackberry that Rodriguez used to communicate with Bosch was deactivated on March 15, 2013, and was no longer in Rodriguez's possession.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

told Rodriguez he had "[n]o worries" and was "good to go." Rodriguez instructed Bosch in one message to "erase all these messages."

In June 2012, Bosch used the service elevator at Rodriguez's direction when meeting in his room at the team's hotel in Atlanta after Rodriguez sent him a message stating "Try to use service elevators. Careful. Tons of eyes." Similarly, when Bosch made a delivery to Rodriguez's residence, Rodriguez instructed him not to "tell anyone your full name." In September 2012, they met in a bathroom at a Starbuck's in Miami. In October 2012, Rodriguez summoned Bosch to Detroit during the playoffs complaining of poor on-field performance. Bosch gave Rodriguez hGH and peptides while in Detroit.

In or around late December 2012 or early January 2013, Bosch discovered that his composition notebooks in which he recorded for several years handwritten information about his clients were missing from his office. Included in those journals were detailed notes about services he provided Rodriguez and other Major League Players. Bosch later learned those notebooks had been stolen by Porter Fischer, a Biogenesis client who became a disgruntled investor. After Bosch refused Fischer's demands for repayment of his investment, Fischer gave the books or copies thereof to the *Miami New Times*.

Bosch informed Velazquez of the theft and the contents of his notebooks. Velazquez was upset at this news but assured Bosch he would take care of the matter. That day or the next, Velazquez told Bosch that Roy Black, then an attorney for Rodriguez, or someone in Black's office had the notebooks, that they had been purchased from Fischer for $10,000, and that Bosch owed Rodriguez that amount in return. Velazquez inquired about any other documents Bosch might possess that identified Rodriguez as a client, as well as Bosch's computer. Bosch elected not to relinquish his computer or apparently any other documents to Velazquez.

On January 25, 2013, MLB received copies of letters from the *Miami New Times* to various MLB Clubs advising that an article was being prepared asserting that a Player or Players on those teams were involved in the use of PES. MLB requested the source documents from the *Miami New Times* to enable MLB to investigate those allegations, but the *Miami New Times* refused. On January 29, 2013, the newspaper published the story identifying Bosch and Biogenesis as having supplied PES to several Major League Players. Rodriguez was mentioned prominently as one of the PES users. The article included excerpts from the Bosch composition notebooks, claimed the records had been authenticated, and alleged

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

the contents were accurate.   Needless to say, publication of this article captured national attention and set the stage for a very public battle between MLB and Rodriguez over the veracity and consequences of those allegations.

In anticipation of imminent publication of the *Miami New Times* article, Velazquez told Bosch not to worry about anything and that Rodriguez would assign him an attorney.  Bosch replied that he preferred to select his own.  Bosch hired Susy Ribero-Ayala, whom he had known since childhood.  Ribero-Ayala testified that the afternoon the article was published, she met with Rodriguez and his lawyers Roy Black and Jared Lopez.  After some preliminary discussions, Lopez handed Ribero-Ayala a draft statement that Rodriguez's lawyers had prepared for Bosch denying the allegations in the *Miami New Times* story.  Ribero-Ayala's initial reaction was that it would not be a good idea for Bosch to issue a statement of denial. Rodriguez persisted, however, noting that he had already issued a public statement that was consistent with the denial being proposed for Bosch.[5]  After further discussion, Ribero-Ayala made some edits to the draft prepared by Rodriguez's lawyers and approved the statement on behalf of Bosch.  That evening, using a wire service recommended by Roy Black, Ribero-Ayala arranged for the statement's release.  It read [PA 11]:

> MIAMI - - (Business Wire) - -
> The following is the statement made by Mr. Bosch's attorney, Susy Ribero-Ayala:
>
> The *Miami New Times* Story dated January 29, 2013 is filled with inaccuracies, innuendo and misstatements of fact.  Mr. Bosch vehemently denies the assertions that MLB players such as Alex Rodriguez and Gio Gonzalez were treated by or associated with him.

Also during this meeting on January 29, 2013, Lopez informed Ribero-Ayala that Rodriguez wished to contribute to Bosch's legal fees.  After several discussions, the parties agreed the amount would be $25,000.  On February 19, 2013, $25,000 was wired from Rodriguez to Ribero-Ayala for this purpose.

Meanwhile, on February 5, 2013, *Yahoo! Sports* published an article containing additional excerpts from the Bosch/Biogenesis documents naming Ryan Braun, Francisco Cervelli, and Danny Valencia as PES clients of Bosch.  All are Major League Players whose names

---

[5] Rodriguez's January 29th statement [MLB 70] read as follows:

The news report about a purported relationship between Alex Rodriguez and Anthony Bosch are not true.  Alex Rodriguez was not Mr. Bosch's patient, he was never treated by him and he was never advised by him.  The purported documents referenced in the story – at least as they relate to Alex Rodriguez – are not legitimate.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

were not previously disclosed in the excerpts printed by the *Miami New Times.* MLB request-ed and was denied by *Yahoo! Sports* those documents or any information from them about the source of those documents.[6]

Subsequent to the publication of the excerpts by the *Miami New Times,* MLB sought to purchase the Bosch composition notebooks from Porter Fischer.  Fischer told MLB that he had been given those notebooks by Ricky Martinez, the Chief Financial Officer of Biogenesis. Fischer added he was told by Martinez to destroy the notebooks but he kept them instead. MLB paid Fischer $5,000 in cash for consulting services, but Fischer ultimately rejected MLB's offer of $125,000 for the documents.  Sometime later, MLB was contacted by a man who identified himself only as "Bobby" and offered the documents for sale.  MLB believed Bobby was associated with Fischer and, after some negotiations, paid Bobby $100,000 in cash for four jump drives containing copies of Bosch's composition notebooks excerpted by the *Miami New Times.*  MLB later paid Bobby an additional $25,000 in cash for Biogenesis documents that MLB determined were not helpful to its investigation of any Player.   Thereafter, MLB learned Bobby was actually a man named Gary Jones.

On March 22, 2013, MLB filed a civil complaint against Bosch and others in Miami-Dade County, Florida, alleging unlawful conduct and tortious interference with the JDA by supplying PES to Major League Players.  MLB sought monetary damages from Bosch for the cost of its investigation, lost profits, injury to MLB's reputation and fan relationships which, if proven, would exceed millions of dollars.  In an amended complaint filed on April 10, 2013, MLB added Bosch's brother as a defendant and subsequently initiated discovery demands from other members of Bosch's family.

On or about April 25, 2013, Bosch was cited by the Florida Department of Health for the unauthorized practice of medicine by holding himself out as a medical doctor by diagnosing and treating patients of Biokem and Biogenesis.  Bosch was fined $1,000 and assessed an additional $4,000 in costs by the Department.  On April 30, 2013, Bosch was approached outside his clinic and interviewed by Pedro Gomez with an ESPN television crew.  During this interview broadcast on ESPN, Bosch falsely denied any knowledge of performance enhancing drugs, and he refused to answer any question from Gomez about Rodriguez.

---

[6] MLB alleges that the documents were provided to *Yahoo! Sports* by Sitrick and Company, Rodriguez's public relations firm.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

In late May 2013, Velazquez arranged for Bosch to meet with Andrew O'Connell, an in-vestigator working for Rodriguez. O'Connell asked Bosch to sign a document attesting that Bosch never supplied Rodriguez with PES and had no personal knowledge that Rodriguez had ever used them. Bosch insisted on having the document reviewed by his attorney. Velazquez urged Bosch to cooperate, and O'Connell made it clear there would be consideration if he signed but no specific amounts were mentioned. Bosch continued his refusal to sign before consulting his attorney. O'Connell kept the copy of the unsigned statement, and the meeting ended.

On May 31, 2013, Bruli Medina Reyes signed an affidavit in the MLB office attesting to his personal observation of Rodriguez's relationship with Bosch, and to Medina's observation of Sucart and Bosch giving Rodriguez injections. Medina is a native and resident of the Do-minican Republic and has been a personal athletic trainer for many professional athletes. Medina met Rodriguez at the 2009 World Baseball Classic. Sucart had arranged for Medina to work for Rodriguez during the 2010 and 2011 seasons. Medina recanted, however, in Sep-tember 2013 after speaking with Jose "Pepe" Gomez, a business associate of Rodriguez. Gomez told Medina that he would take care of him, and did so by providing Medina with legal representation expenses and separate lodging and expenses from those made available by MLB. Reyes testified herein that he felt pressured by MLB to sign the May 31, 2013 affidavit because MLB investigators told him that his visa to work in the U.S. could be in jeopardy. Medina claimed that statements in his affidavit about observing PES use by Rodriguez were false.

On June 3, 2013, MLB and Bosch entered into a mutual cooperation agreement. Bosch promised to proffer truthful information to MLB and testify if necessary regarding any Major League Player or individuals acting on their behalf regarding the acquisition, possession, or use by them of any PES. In exchange, MLB promised to dismiss Bosch and his brother from MLB's civil suit, to not seek testimony or discovery from Bosch family members, and to inform law enforcement agencies of his cooperation. MLB also promised to pay Bosch's legal fees, pay up to $2,400 per day for personal security, and hold him harmless from civil liability from any claim brought by a Player, provided Bosch fulfilled his obligations under the agreement. In

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

addition, Bosch would be allowed to discuss with anyone the history of his involvement with Players, which could result in book, movie, and/or other media deals.[7]

MLB convened an investigatory interview with Rodriguez on July 12, 2013. At that session, Rodriguez declined to answer any questions about his involvement, if any, with Bosch or Biogenesis on Fifth Amendment grounds. The parties have stipulated that Rodriguez has tested negative for PES under the JDA on the following occasions since 2010: October 5, 2010, January 19, 2011, February 19, 2011, May 25, 2011, July 7, 2011, February 24, 2012, February 28, 2012, May 8, 2012, July 3, 2012, October 17, 2012, January 31, 2013, and August 10, 2013. There were no positive tests conducted under the JDA for Rodriguez during this same period.

On August 5, 2013, Commissioner Allan H. Selig issued Rodriguez the following Notice of Discipline [JX 3]:

> Dear Alex:
>
> This letter is to inform you that, pursuant to Section 7.G.2 of Major League Baseball's Joint Drug Prevention and Treatment Program ("Program") and Article XII(B) of the Basic Agreement (and subject to the final paragraph of this letter), you are hereby suspended for 211 regular-season games (plus, if applicable, any 2013 postseason games in which you would have been eligible to play) for violating the Program and for engaging in other conduct that is materially detrimental or materially prejudicial to the best interests of Baseball. This represents a suspension for the remainder of the 2013 season (including postseason) and the entire 2014 regular-season.
>
> Your discipline under Section 7.G.2 of the Program is based on your intentional, continuous and prolonged use and possession of multiple forms of prohibited Performance Enhancing Substances, including but not limited to Testosterone, Human Growth Hormone, and IGF-1, that you received as a result of your relationship with Anthony Bosch beginning in the 2010 championship season and ending in or about December 2012. Considering all of the facts and circumstances of which I am aware, including your statements during prior investigatory interviews regarding your knowledge of, and purported adherence to and support for, the requirements of the Program, the substantial length of time you used Performance Enhancing Substances, the quantity and variety of Performance Enhancing Substances you consumed and the frequency with which you consumed them, and your efforts to conceal such use and avoid a positive test under the Program, I have determined that your conduct in 2010, 2011 and 2012 evinces a wanton and willful disregard for the requirements of a Program that was jointly agreed to and is jointly administered by the Office of the Commissioner and the Major League Baseball Players Association ("MLBPA").

---

[7]   After it was reported that MLB and Bosch had entered into an agreement, Jim McCarroll, an attorney for Rodriguez, called Ribero-Ayala to ask whether there was anything Rodriguez "could do for Bosch" [TR 1598]. McCarroll subsequently emailed his contact information to Ribero-Ayala, but the two never spoke thereafter.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

Your discipline under Article XII(B) is for attempting to cover-up your violations of the Program by engaging in a course of conduct, beginning in or about January 2013, that was intended to obstruct and frustrate the office of the Commissioner's investigation of Biogenesis and Anthony Bosch.

Moreover, you should be aware that the office of the Commissioner continues to actively investigate allegations that you violated the Program in 2009 by using and possessing Prohibited Substances that you received from Dr. Anthony Galea, and whether you lied to representatives of the office of Commissioner during your April 1, 2010 and August 26, 2011 investigatory interviews on that subject.  If I believe that additional discipline is warranted based on that investigation, I will issue a separate notice of discipline.

As you know, my office provided you with the opportunity to explain the allegations against you during an investigatory interview conducted on July 12, 2013 in Tampa. Despite your public proclamations of your innocence, you chose not to answer questions during that interview reportedly based on your Fifth Amendment right against self-incrimination as described in the *Ferguson Jenkins* case (Panel Decision No. 41), including questions about your use of Performance Enhancing Substances provided by Anthony Bosch, questions about attempts by you and your representatives to obstruct the office of the Commissioner's investigation, and questions regarding whether you provided truthful responses in the interviews my office conducted with you regarding your involvement with Dr. Galea.  I note this not because your decision to assert the Fifth Amendment during your July 12 interview weighed in my decision regarding the appropriate level of discipline for your conduct (it did not), but rather because, as a result of your refusal to answer questions during the interview, I am unable to consider any explanations that you may have for your conduct in determining discipline.  Thus, my disciplinary decision is based on evidence uncovered during the investigation, which clearly establishes your egregious violations of the Program and your violation of Article XII(B) by attempting to obstruct and frustrate our investigation.

Your suspension is effective on Thursday, August 8, 2013.  You will be placed on the Restricted List and will be eligible for reinstatement at the conclusion of your suspension.  In the event you commit a subsequent violation of the Program in the future, you will be suspended permanently from Major League Baseball.

I also want to make you aware that we have communicated the basis for your discipline to your collective bargaining representative, the MLBPA.  Despite numerous statements to the contrary, the MLBPA has now taken the position that your discipline under the Program can only be imposed in accordance with the schedule set forth in Section 7.A.  Although we believe the Union is incorrect, in the event the MLBPA prevails in your discipline must be in accordance with the schedule and Section 7.A, the number of individual violations of the Program you have committed will necessitate the discipline be converted to a permanent suspension pursuant to Section 7.A.3.

Sincerely,

Commissioner Allen H. Selig

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

On August 6, 2013, MLBPA General Counsel David M. Prouty filed the instant Notice of Grievance challenging the suspension as discipline without just cause in violation of the Basic Agreement and the JDA [JX 4]. On August 13, 2013, MLB Senior Counsel Paul V. Mifsud, Jr., denied the grievance at Step 1 as without merit [JX 5]. On August 22, 2013, MLBPA Assistant General Counsel Ian Penny appealed the grievance to Step 2 [JX 6]. The instant arbitration before the Panel as constituted ensued. In accordance with the provisions of the JDA, imposition of the suspension was stayed until completion of the arbitration process.

The JDA mandates that appeals be conducted expeditiously. Hearing dates were scheduled and convened at the direction of the Panel Chairman as early and often as possible. MLB, the MLBPA, and Rodriguez were afforded a full opportunity to call and cross-examine witnesses under oath, introduce documents, and present argument. A transcript of the proceedings was prepared. Upon receipt of post-hearing briefs and reply briefs, the case was submitted for decision. No useful purpose is served by summarizing the voluminous record of evidence and argument, all of which has been reviewed and considered. Only those matters deemed necessary in deciding the suspension at issue are discussed by the Panel herein.[8]

The Panel takes arbitral notice of the fact, which is a matter of public record, that 13 Major League Players were suspended in 2013 for violations of the JDA in connection with the Biogenesis matter. The parties have represented to the Panel that those suspensions were entered into on a non-precedential basis. This means the fact or length of the suspensions may not be used as precedent or evidence in this case. For this reason, the suspensions of any and all of those Players has not been considered in any way in the development of or the rationale for the opinion and award that follows.

///

---

[8] The arbitration hearings in this proceeding were conducted pursuant to the "Rules of Procedure" set forth in Appendix A to the Basic Agreement. Under that provision, the Panel Chair "shall be the judge of the relevancy and materiality of the evidence offered and conformity to legal rules of evidence shall not be necessary." Prior to and in the course of the hearing, rulings were made on various evidentiary and discovery issues raised by one party or the other pursuant to this of Procedure. Those rulings, many of which were the subject of separate written orders, shall be deemed incorporated into this decision.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

## EXCERPTS FROM THE JOINT DRUG PREVENTION AND TREATMENT PROGRAM [JX 2]

### 2.   PROHIBITED SUBSTANCES

All Players shall be prohibited from using, possessing, selling, facilitating the sale of distributing, or facilitating the distribution of any Drug of Abuse, Performance Enhancing Substance and/or Stimulant (collectively referred to as "Prohibited Substances").

\*   \*   \*

#### B. Performance Enhancing Substances

Any and all anabolic androgenic steroids covered by Schedule III of the Code of Federal Regulations' Schedule of Controlled Substances ("Schedule III"), as amended from time to time, and the categories of hormones and agents with antiestrogenic activity that are set forth in Nos. 68 - 73 below, shall be considered Performance Enhancing Substances covered by the Program. Anabolic androgenic steroids (including hormones) with antiestrogenic activity, that may not be lawfully obtained or used in the United States (including, for example, "designer steroids") also shall be considered Performance Enhancing Substances irrespective of whether they are covered by Schedule III. The following is a non-exhaustive list of substances that shall be considered Performance Enhancing Substances covered by the Program:

58. Testosterone

65. Human Grown Hormone (hGH)

66. Insulin-like Growth factor (IGF-1), including all isomers of IGF-1 sometimes referred to as Mechano Growth Factors

67. Gonadotrophins (including LH and hCG)

\*   \*   \*

### 6.   DISCLOSURE OF PLAYER INFORMATION

#### A.  Disclosure of Information

2.  Any and all information relating to a Player's involvement in the Program, including, but not limited to, the fact or the results of any Prohibited Substance testing to which the Player may be subject, and any discipline imposed upon the Player by the Commissioner's Office shall remain strictly confidential. Notwithstanding the foregoing, if the Player is suspended by the Commissioner's Office, pursuant to Section 7 below, the suspension shall be entered in the Electronic Baseball Information System as a suspension for a specified number of days for a violation of the Program, and the only public statement from the Commissioner's Office shall be that the Player was suspended for a specified number of days for a violation of the Program. If the Player has tested positive for a Prohibited Substance, the specific substance and the category of Prohibited Substance (e.g., Performance Enhancing Substance or Stimulant) for which he tested positive may also be disclosed by the Commissioner's Office. If the Player's suspension is for a violation of Section 3.F.2 or 3.F.3, the Commissioner's Office

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

may so disclose.   A Player's Club may issue a public statement in response to a Player's suspension provided that a draft of the statement is sent to the Players Association at least 60 minutes prior to its issuance, and the Club considers in good faith any comments provided by the Players Association.

In addition, other than in the case of a first positive test for a Stimulant, the Commissioner's Office may, without a Player's consent, disclose the Player's status under the Program, including a Player's likely availability to his Club, and/or the reason for any discipline imposed on the Player to the General Manager of the Player's Club, who shall keep such information confidential, except that the General Manager, and only he, may disclose such information to the General Manager of a Club that has expressed an interest in acquiring such Player's contract via assignment, and that General Manager also shall keep such information confidential.

3. Decisions of the Arbitration Panel, and the record of proceedings before the Panel in matters arising under the Program, shall not be disclosed by the Parties, other than to their respective constituents (and with instructions that prohibit further disclosure), unless the Parties agree or the Panel directs otherwise. (See also Section 8.C below.)

4. Notwithstanding anything to the contrary in the Program, either Party may disclose publicly details of a Player's test results, testing history and/or the Player's challenge to discipline imposed pursuant to Section 7 below to the extent necessary to respond to any inaccurate or misleading claims by that Player that could undermine the integrity and/or credibility of the Program.

7.     DISCIPLINE

A. Performance Enhancing Substance Violations

A Player who tests positive for a Performance Enhancing Substance, or otherwise violates the Program through the use or possession of a Performance Enhancing Substance, will be subject to the discipline set forth below.

1. First violation: 50-game suspension;

2. Second violation: 100-game suspension; and

3. Third violation: Permanent suspension from Major League and Minor League Baseball; provided, however, that a Player so suspended may apply, no earlier than one year following the imposition of the suspension, to the Commissioner for discretionary reinstatement after a minimum period of two (2) years. The Commissioner shall hear any such reinstatement application within thirty (30) days of its filing and shall issue his determination within thirty (30) days of the closing of the application hearing. A Player may challenge the Commissioner's determination on such application under the Grievance Procedure set forth in Article XI of the Basic Agreement and any such challenge may include a claim that a suspension beyond two (2) years would not be for just cause; provided, however, that the Arbitration Panel shall have no authority to reduce any suspension imposed pursuant to this Section 7.A.3 to a period of less than two (2) years.

\*   \*   \*

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

**C. Failure to Comply with an Initial Evaluation or a Treatment Program [Drugs of Abuse]**

A Player who is determined by the Treatment Board to have not complied with an Initial Evaluation or a Treatment Program for a Drug of Abuse (other than Marijuana, Hashish and Synthetic THC) will be subject to the discipline set forth in this Section 7.C. If the Treatment Board determines that a Player refused to submit to an Initial Evaluation, or refused to participate in mandatory sessions with his assigned health professional, the Player will be subject to discipline for just cause by the Commissioner without regard to the progressive discipline schedule set forth below. For all other violations, the Player will be subject to the following discipline schedule:

1. First failure to comply: At least a 15-game but not more than a 25-game suspension;

2. Second failure to comply: At least a 25-game but not more than a 50-game suspension;

3. Third failure to comply: At least a 50-game but not more than a 75-game suspension;

4. Fourth failure to comply: At least a one-year suspension; and

5. Any subsequent failure to comply by a Player shall result in the Commissioner imposing further discipline on the Player. The level of the discipline will be determined consistent with the concept of progressive discipline.

\* \* \*

**G. Other Violations**

2. A Player may be subjected to disciplinary action for just cause by the Commissioner for any Player violation of Section 2 above not referenced in Section 7.A through 7.F above.

**L. Notice of Violation**

If the notification requirements of Section 3.G are satisfied, a Player will not be disciplined for a second or subsequent violation involving a Prohibited Substance that occurred prior to the time that the Player received actual notice of his first positive test result or non-analytical positive for the same Prohibited Substance, provided that the Player's discipline for his first violation was not overturned or rescinded.

# EXCERPT FROM THE BASIC AGREEMENT [JX 1]

**ARTICLE XII—Discipline**

**B.      Conduct Detrimental or Prejudicial to Baseball**

Players may be disciplined for just cause for conduct that is materially detrimental or materially prejudicial to the best interests of Baseball including, but

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

> not limited to, engaging in conduct in violation of federal, state or local law. The Commissioner and a Club shall not discipline a Player for the same act or conduct under this provision. In cases of this type, a Club may only discipline a Player, or take other adverse action against him, when the Commissioner defers the disciplinary decision to the Club.

## POSITIONS OF THE PARTIES

MLB contends that Rodriguez was disciplined for just cause. MLB maintains Rodriguez committed multiple violations of the JDA over the course of three seasons by the continuous use and possession of a variety of PES. MLB asserts the multiple efforts by Rodriguez to obstruct MLB's investigation of his violations of the JDA violated the Basic Agreement. MLB argues adverse inferences be drawn from Rodriguez's failure to testify under oath in this proceeding or present other witnesses to refute the evidence of his misconduct. MLB contends the penalty in this case is appropriate and justified in light of the scope and gravity of the misconduct by Rodriguez, and that the settlements reached with other Players involved in Biogenesis cannot be considered by agreement of the bargaining parties as previously ruled upon by this Panel. Accordingly, MLB urges the grievance be denied.

Rodriguez contends MLB has failed to meet its burden of proving the alleged misconduct by clear and convincing evidence. Rodriguez argues MLB did not show he possessed and used PES and that the testimony by Bosch, his notebooks, and the BBM's are inherently unreliable, must be stricken, and can be afforded no weight. Rodriguez contends that science establishes he did not use PES. Rodriguez also asserts MLB failed to establish he obstructed MLB's investigation of Biogenesis and Bosch. Rodriguez further maintains that all of the evidence presented by MLB is irrevocably tainted by investigatory misconduct and coercion of witnesses, including Bosch. Finally, Rodriguez claims the suspension is wholly inappropriate when compared to those given other Players with alleged ties to Biogenesis and Bosch. Thus, Rodriguez asks the suspension not be upheld.

The MLBPA joins Rodriguez in the assertion that MLB has failed to prove he violated the BA or JDA as alleged in the Notice of Discipline. If any discipline is warranted, the MLBPA contends the 211-game suspension is unprecedented, inappropriate, and not supported by just cause. The MLBPA asserts the JDA provides a 50-game benchmark for a first offense which is fully consistent with penalties accorded other Players. The MLBPA further asserts there is

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

significant precedent to establish that a 211-game suspension is disproportionate with the alleged offenses. Finally, the MLBPA argues that mitigation is required because of blatant misconduct by MLB by coercing Bosch to cooperate and violating Rodriguez's confidentiality rights under the JDA.

## OPINION OF THE PANEL CHAIRMAN

*Introduction*

This is an appeal by Alexander Rodriguez of a 211-game suspension which covered the remainder of the 2013 season and the 2014 season and was issued by MLB for alleged violations of the Basic Agreement and Joint Drug Agreement. The Basic Agreement and JDA contain a grievance procedure which allows a Player who chooses to contest the validity of a suspension to have the matter decided by a neutral arbitrator. These collectively bargained agreements require MLB to have just cause to impose a suspension on any Player. This means that MLB carries the burden of establishing just cause in arbitration by demonstrating that some or all of the alleged offenses occurred, and, if so, that its imposed penalty is appropriate. The sole question presented by the parties for decision by this Panel is whether MLB had just cause to suspend Rodriguez for the remainder of the 2013 season and the 2014 season (211 games) and if not the appropriate remedy.

MLB contends Rodriguez repeatedly violated the JDA over a three-year period by use and possession of multiple banned substances. MLB asserts Rodriguez then aggravated his offenses by obstructing MLB's investigation in violation of the BA. MLB defends the 211-game suspension as appropriate given the nature, extent, and severity of his offenses. In defense of these allegations, Rodriguez through counsel flatly denies any use or possession of PES during the period in question. Rodriguez and the MLBPA assert no credible evidence has been presented by MLB which establishes any violation of the BA or JDA. Alternately, Rodriguez and the MLBPA argue MLB is prevented from imposing any penalty because of egregious misconduct during the course of its investigation. The MLBPA and Rodriguez further contend the 211-game penalty cannot be justified when compared to suspensions received by other Players for drug or PES violations.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

A review of all the evidence and argument presented by all parties in this proceeding clearly and convincingly establishes Rodriguez committed multiple violations of the JDA and BA warranting a substantial disciplinary penalty.[9]   It follows that the suspension imposed by MLB, as reduced by this Panel, will be sustained.

*JDA Violations*

The evidence confirms that Rodriguez used and/or possessed three discrete PES banned by Section 2.B. of the JDA during the three-year period in question:  testosterone, IGF-1, and hGH.   Direct evidence of those violations was supplied by the testimony of Anthony Bosch and corroborated with excerpts from Bosch's personal composition notebooks, BBMs exchanged between Bosch and Rodriguez, and reasonable inferences drawn from the entire record of evidence.

In August 2010, Bosch drew blood from Rodriguez, studied the test results, designed a protocol of PES and other supplements that Bosch and Rodriguez believed erroneously or otherwise would enhance his performance on the field.   Rodriguez commenced the program that month with those substances supplied by Bosch to Rodriguez's cousin, Sucart.  As shown in that protocol, Rodriguez was initially supplied hGH for use six days a week through October 2010 and then five days a week in November 2010.   Testosterone was to be used daily in multiple modalities during that period.   IGF-1 was added in October 2010 for daily administration, and was continued in November 2010.[10]   Significantly, Bosch's testimony regarding the use and possession of these three substances by Rodriguez was neither refuted nor contradicted with testimony under oath by Velasquez or Sucart, whom Bosch identified as witnesses to the violations, or by Rodriguez himself.[11]   From these unrebutted facts, the conclusion is manifest that in 2010 Rodriguez committed three distinct violations of the JDA by use and/or possession of testosterone, IGF-1, and hGH.

---

[9]   The parties disagree as to the quantum of proof needed for MLB to establish a non-analytical positive in violation of the JDA and/or a violation of the BA.  MLB asserts the standard is no greater than a preponderance of the evidence, while the MLBPA and Rodriguez urge the higher standard of clear and convincing evidence be applied.  There is no need to resolve the dispute in this case because the violations of the JDA and BA found herein are established by clear and convincing evidence.

[10]   In November 2010, Bosch added hCG (human chorionic gonadotropin) to the protocol but was unable at arbitration to verify with certainty when it was alleged to have been supplied or administered to Rodriguez.

[11]   Rodriguez elected not testify in this proceeding.  Nor did Velazquez or Sucart appear as witnesses.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

In 2011, the evidence establishes Bosch continued to supply Rodriguez through Sucart with testosterone, IGF-1, and hGH. Bosch drew blood from Rodriguez in Miami or New York at least four or five times during the year for the express purpose of monitoring the effect of his protocols and, where necessary, adjusting the protocols. That year Bosch personally administered infusions to Rodriguez that always included testosterone, hGH, and other growth hormone releasing peptides ("peptides").[12] In late 2011, after Rodriguez fired Sucart, Rodriguez communicated directly with Bosch regarding his use and administration of the PES supplied by Bosch. Again, the testimony from Bosch describing these activities was not contradicted or refuted by Rodriguez, Sucart, or Velazquez, the individuals described by Bosch with firsthand knowledge of the possession, use and/or large monthly payments in cash for the PES. From this evidence, a finding Rodriguez continued to violate the JDA in 2011 by use and possession of testosterone, IGF-1, and hGH is established.

In 2012, with Sucart no longer involved, Bosch visited and treated Rodriguez directly at least twice a month with testosterone creams and troches, hGH, and IGF-1. Bosch injected Rodriguez with testosterone suspensions at least four times. BBMs exchanged between Bosch and Rodriguez confirm that Rodriguez was supplied subcutaneous syringes containing hGH and IGF-1. In October 2012, Rodriguez summoned Bosch to Detroit because he was concerned about his poor on-field performance. Bosch traveled to Detroit and delivered hGH to Rodriguez at Rodriguez's hotel. Once again, the testimony from Bosch describing the direct deliveries of banned substances to Rodriguez was not contested by testimony from Rodriguez. Based on these facts, a finding that Rodriguez continued to violate the JDA in 2012 by use and possession of testosterone, IGF-1, and hGH is also established.

Contrary to the claim of Rodriguez, the challenges lodged to the credibility of Bosch's testimony do not effectively refute or undermine the findings of JDA violations. For purposes of this case, it is accepted that Bosch was a "drug dealer" whose activities in obtaining and dispensing prescription medications, including PES, to his clients violated federal and state laws and regulations. It is recognized that immediately after the *Miami New Times* published excerpts from his notebooks, Bosch denied having supplied any PES to Rodriguez in a press release as well as in an April 30, 2013, televised interview with ESPN. On the witness stand

---

[12] The parties disagree whether the peptides supplied to Rodriguez are banned substances under the "catch-all" language in Section 2 of the JDA. The Panel need not resolve this question in order to resolve the discipline herein, and, in any event, the record of evidence is insufficient to make such a determination.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

herein, Bosch refused to answer by claiming a Fifth Amendment privilege many questions about his activities with other Players, clients who may be minors, the sources of the PES, or his finances related to activities not involving Rodriguez. Bosch also had refused to discuss with MLB his activities with Rodriguez or other players named by the *Miami New Times* until he entered into the June 3, 2013 mutual cooperation agreement. In exchange for providing truthful information, MLB promised to dismiss Bosch and his brother from its civil suit, refrain from seeking information or discovery from other Bosch family members, inform law enforcement of Bosch's cooperation, indemnify Bosch from civil liability by suits from Players as a result of his cooperation, and reimburse Bosch for attorneys fees and security costs in connection with its investigation. Rodriguez argues the significant benefits accorded Bosch in this arrangement motivated him to fabricate his activities with Rodriguez and other players. Yet witnesses who testify in court or in arbitration to criminal or civil violations by others are often participants in those events, and argued to have a motive or incentive to lie. The credibility of those witnesses is always determined by a trier of fact, whether a judge, jury, or neutral arbitrator, on a case-by-case basis.[13]

In this case, the testimony under oath from Bosch about JDA violations by Rodriguez was direct, credible, and squarely corroborated by excerpts from several of the hundreds of pages of his personal composition notebooks that were stolen in late December 2012 or early January 2013. The original notebooks have not been located or produced. Rodriguez asserts the copies in evidence are unreliable because the originals were stolen, the copies introduced were not in order, there is no way to know if the copies are complete, the time and date of many entries are unclear, and the notebooks were never kept in a secure location while in Bosch's possession. Despite these concerns, Bosch verified the entries relied upon herein were in fact his notes made contemporaneously with the events he described. No direct evidence was presented to demonstrate the excerpts he identified from the copies of his notebooks that implicated Rodriguez had been forged or fabricated. Bosch had many clients to whom he prescribed many substances, banned or otherwise. As a practical matter, he needed to keep track of clients, protocols, and payments. Bosch elected to use those composition notebooks to record this information by hand for his own use and reference. The proto-

---

[13] In *Vida Blue*, Panel Dec. No. 61 (Bloch, 1984), evidence from a convicted drug dealer was relied upon by the Panel in finding a substance abuse violation and in formulating the penalty.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

cols, visits, and cash payments pertaining to Rodriguez he wrote in the excerpts he identified in this proceeding confirm and corroborate the JDA violations he has described.

Similar support for his testimony is found in the evidence of BBM exchanges between Rodriguez and Bosch. Those messages corroborate the JDA violations described by Bosch as well as illustrate the course and nature of their dealings. The BBMs by and to Rodriguez address doses, timing, and administration of PES to Rodriguez, as well as payment for drugs and services. The BBMs also reflect the deliberate efforts taken by Bosch and Rodriguez to conceal their activities and to avoid a positive MLB drug test. Rodriguez challenges the validity of those messages by targeting a few anomalous entries, unexplained gaps, and MLB's refusal to produce the three BlackBerry devices containing those messages for inspection by his own expert. The expert hired by MLB to study those devices testified credibly that there was no evidence of tampering. The expert hired by Rodriguez countered with conjecture and supposition about the data, but no direct or persuasive evidence of any tampering.[14] Counsel for Rodriguez confirmed the PINs used by MLB to identify the messages came from devices belonging to Rodriguez. Significantly, the key exchanges corroborating the JDA violations were verified by Bosch as accurate. Equally significant is the absence of any direct evidence from Rodriguez, either with testimony or from his devices, which contradicts or refutes any of the BBMs in evidence and/or the testimony from Bosch confirming those exchanges. When viewed as a whole, the hundreds of messages exchanged between Bosch and Rodriguez plainly support the findings of JDA violations herein.

Rodriguez complains the case as presented by MLB lacks specificity concerning the precise dates and times, dosages, and frequency of the alleged violations. Rodriguez decries the absence of documentation concerning the sources of PES obtained by Bosch or introduction of samples which confirm the substances Bosch claimed he used were indeed ones banned by the JDA. Yet these and other deficiencies in MLB's case cited by Rodriguez do not eviscerate credible testimony from Bosch about his activities in supplying and administering PES to Rodriguez over a three-year period or the BBMs and composition notebook pages that confirm the violations occurred. The only reasonable inference to be drawn from the weight of the evidence is that Rodriguez violated the JDA as alleged.

---

[14] Rodriguez declined the opportunity offered by the Panel to have Bosch's devices examined by an independent expert to confirm or refute the findings of MLB's expert related to the reliability of the data thereon.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

The claim by Rodriguez that science exonerates him in this case is not supported by any evidence in this record. It is recognized Rodriguez passed eleven drug tests administered by MLB from 2010 through 2012. The assertion that Rodriguez would have failed those tests had he consumed those PES as alleged is not persuasive. As advanced as MLB's program has become, no drug testing program will catch every Player. In this case, the blood testing required to detect hGH or IGF-1 had not yet been implemented in the JDA and therefore was not administered during the 2010, 2011, and 2012 seasons. With respect to testosterone, the record establishes that during the period in question it was possible for an individual to pass a drug test despite having recently used the substance, depending on variables such as the route of administration (*i.e.*, transdermal, sublingual, or intramuscular), dosage, concentration, the baseline value of the individual's natural testosterone to epitestosterone ratio ("T/E"), and how soon after use the individual's urine sample is collected.[15] Bosch testified that he considered several of these variables when developing Rodriguez's protocols, and the BBM communications between Bosch and Rodriguez show multiple exchanges where Bosch instructed Rodriguez to use testosterone at such times, and in such forms and doses, as would prevent Rodriguez from testing positive. For these reasons, the absence of a positive test during the three years in question, in and of itself, does not and cannot overcome the unrebutted direct evidence in this record of possession and use. In any event, a positive drug test is not required to establish a violation of the JDA for use or possession of a PES.

*Obstruction*

MLB charges Rodriguez with violating Article XII(B) of the BA by attempting to cover-up his JDA violations through a course of conduct since January 2013 intended to obstruct and frustrate MLB's investigation of Biogenesis and Bosch. MLB accuses Rodriguez and his representatives of purchasing and then destroying the original Bosch composition notebooks, as well as deactivating and destroying his own BlackBerry to prevent MLB from learning their contents. MLB also claims Rodriguez and his representatives improperly pressured Bruli Medina Reyes to recant the affidavit he gave MLB and to provide untruthful testimony at

---

[15] Detecting the presence of testosterone in urine samples with a T/E ratio of lower than 4:1 was more difficult prior to 2013 because the IRMS analysis needed to detect exogenous testosterone in a urine sample was typically only triggered by the laboratory when the T/E ratio was 4:1 or greater. In 2013, the parties instituted a longitudinal profiling program that enhanced the ability of the laboratory to detect testosterone in samples with a T/E ratio lower than 4:1 based on changes in a player's T/E ratio from sample to sample.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

arbitration.  MLB alleges that Rodriguez's press release on January 29, 2013, falsely denying any relationship with Bosch, and Rodriguez's role in facilitating Bosch's own false public denial later that day, which included a commitment by Rodriguez to pay Bosch $25,000 for attorneys fees, also violated the BA.  MLB further asserts that Rodriguez's attempt on May 31, 2013, to get Bosch to sign a false affidavit and the offer to pay Bosch to leave the country rather than testify in this proceeding constitute additional examples of improper conduct in violation of the BA meriting a severe disciplinary response.  For his part, Rodriguez denies through counsel having possessed or destroyed Bosch's original composition notebooks, any improper attempts to influence the testimony of Medina or Bosch, or that the evidence supports any of these charges.

Deliberate efforts to obstruct an MLB investigation under the JDA, or to cover-up misconduct by a Player who is subject to such an investigation, if established, may subject a Player to additional disciplinary sanctions under Article XII(B) of the Basic Agreement.  In this case, the evidence considered in its entirety supports a minimum of two such violations. Rodriguez, having himself publicly denied being treated or advised by Bosch – a denial which he knew to be false – played an active role in inducing Bosch to issue his own public denial on January 29, 2013, which Rodriguez also knew to be false.  Rodriguez also attempted to induce Bosch to sign a sworn statement on May 31, 2013, attesting that Bosch never supplied Rodriguez with PES and had no personal knowledge that Rodriguez had ever used them, statements that Rodriguez also knew to be false.  These actions, viewed in the context of the record as a whole, were clearly designed to cover up Rodriguez's relationship with Bosch and the fact that Rodriguez had received PES from Bosch, to inhibit MLB's efforts to investigate Rodriguez's use and possession of PES, and to avoid punishment under the JDA.  The remaining allegations of obstruction, while troubling, need not be addressed because they would not affect the ultimate determination regarding the appropriate penalty in this matter.

*Confidentiality*

Under the JDA, all involved parties are obligated to maintain the confidentiality of Player information and of the proceedings before the Panel, except in limited circumstances.  The JDA also contains an exception to the confidentiality provisions in Section 6.A.4, which states:

> Notwithstanding anything to the contrary in the Program, either Party may disclose publicly details of a Player's tests, testing history and/or Player's challenge

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

> to discipline imposed pursuant to Section 7 below to the extent necessary to re-
> spond to inaccurate or misleading claims by the Player that could undermine the
> integrity and/or credibility of the Program.

In the past, MLB and the MLBPA have been very successful in keeping appeal proceedings private and confidential in matters involving a positive test result. But in this case, the alleged connection between Biogenesis and many MLB Players, including Rodriguez, was widely reported by the media and closely followed by the public for many months. Suffice it to say, media interest remained intense throughout the hearings and the scrutiny will undoubtedly continue until completion of this process and beyond.

At the start of these proceedings, and a number of times thereafter, the Panel reminded the parties to observe the confidentiality requirements of the JDA. Despite these admonishments, each side made public pronouncements concerning evidence and argument elicited during these proceedings.[16] In addition, information developed at the hearings appeared in a number of media reports, which cited either representatives of MLB or Rodriguez as sources. Whenever a breach of the JDA's confidentiality mandate and request for sanctions was brought to the Panel's attention, the charge was met with a denial, a claim the information was already public, or defended as rebuttal to information made public by the other side. The Panel deferred receiving evidence or ruling on these individual claims of breach until the case was submitted for decision.

After reviewing the entire record in this case, no action will be taken by the Panel at this juncture on the respective claims for breach of confidentiality. The stipulated issue presented to the Panel is just cause for the suspension. Given the mandate for expeditious handling of the appeal of the suspension and the amount of time necessary for each side to present its evidence, the Panel deferred making inquiries to determine the sources of those leaks and whether they could be held accountable for their actions.[17] After reviewing all the evidence in this record on the suspension, resort to the various media reports brought to the Panel's attention – however described or ascribed – was not necessary. They had no influence and

---

[16] The Biogenesis matter involved investigation by public agencies and court actions in Florida initiated well prior to the imposition of player suspensions. MLB went to court to compel production of information from various sources believed to be relevant to its investigation. Soon after commencement of hearings herein, Rodriguez filed a civil suit in New York against MLB that paralleled in many respects the evidence and argument in this proceeding. As a result, much of the evidence and argument herein overlaps with those other matters, which continue to be widely reported in the media.

[17] The Panel does not have authority to enjoin third parties or the media from breaching the confidentiality provisions of the JDA.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

played no role in the deliberations of the Panel or the outcome.   For these reasons, the claims by MLB and Rodriguez against the other of improper leaks to the media or the remedies sought for breach of confidentiality will not be addressed in this case.

*Penalty*

Having determined Rodriguez violated the JDA and the Basic Agreement, the discussion turns to the appropriate disciplinary penalty.  The suspension imposed by MLB covered the remainder of the 2013 season and all of 2014, and amounted to 211 games.  MLB asserts that the penalty is fully merited given the depth and severity of Rodriguez's offenses.  Rodriguez and the MLBPA, however, argue a 211-game penalty is unwarranted and unprecedented.  Rodriguez and the MLBPA view 50 games as the maximum suspension allowed by the JDA for a first PES violation.  They further maintain any penalty must be reduced, if not eliminated altogether, due to MLB misconduct during the investigation, and that no penalty is warranted for the alleged obstruction violations of Article XII(B) of the Basic Agreement.

MLB, the MLBPA, and the Player agree that Section 7.G.2 of the JDA supplies the governing framework for this case.  The record establishes that cases such as this, involving continuous and prolonged use or possession of multiple substances (as opposed, *e.g.*, to a single positive test), were intended to be handled under Section 7.G.2 rather than Section 7.A.  Section 7.G.2 of the JDA states that "[a] Player may be subjected to disciplinary action for just cause by the Commissioner for any Player violation of Section 2 above not referenced in Section 7.A through 7.F above."  The parties to the JDA both agree that Section 7.A does not reference a violation of the JDA involving the continuous use or possession of multiple Prohibited Substances over a prolonged period of time.  Indeed, the express language of Section 7.A specifies a 50-game suspension for first offenders for the use or possession of "a Performance Enhancing Substance" (emphasis added).  The parties agree, however, that for violations of the type presented by this case, the Commissioner is not limited to the disciplinary schedule set forth in Section 7.A, but rather can fashion an appropriate penalty, provided that such penalty is supported by principles of just cause.

Section 7.G.2 requires that a just cause standard be applied in the assessment of MLB's disciplinary action.  Common factors to be evaluated in the determination of just cause are proportionality (does the level of discipline bear a reasonable relationship to the serious-

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

ness and frequency of the offense), whether the discipline is progressive (is the object to correct rather than to punish), and compliance with the labor agreement (is the penalty consistent with a framework adopted by the parties). *See* St. Antoine, *The Common Law of the Workplace (2nd ed. 2005)* §6.7. Prior Arbitration Panels in baseball have variously described and uniformly applied these factors when assessing just cause discipline imposed on MLB Players.

While, as explained above, Section 7.A does not control in this case, the penalty structure that the parties agreed to in Section 7.A does provide a useful guidepost in evaluating whether the suspension of Rodriguez for the remainder of the 2013 season and the 2014 season is supported by just cause. The parties in Section 7.A adopted a system of progressive discipline for PES violations and established a benchmark of 50 games for one violation, 100 games for a second violation, and a lifetime ban for a third violation. The MLBPA and Rodriguez argue that if Section 7.A were applicable to this case, Rodriguez should receive no more than a 50-game suspension because his use and possession constitutes his first violation of the JDA. But the record here establishes that Rodriguez used or possessed three separate PES on multiple occasions over the course of three years. In Panel Decision No. 121 (*Neifi Perez*) (Das, 2008), the Panel held that the language of the JDA "reasonably implies a general understanding that separate uses are subject to separate discipline." (*Id.* at 22). While the provisions of Section 7.L protect a player from discipline for a second or subsequent non-analytical positive that occurred prior to the time that the player received actual notice of his first non-analytical positive for the *same* Prohibited Substance, the provision does not protect players from being separately disciplined for each use or possession of a *different* Prohibited Substance prior to being provided notice of the first violation. Thus, it is absolutely clear that if the disciplinary schedule in Section 7.A did apply automatically to this case, Rodriguez would receive a penalty of greater than 50 games based on his separate uses and possession of multiple Prohibited Substances between 2010 and 2012.

MLB asserts that if the Commissioner were bound by the progressive disciplinary schedule set forth in Section 7.A of the JDA, Rodriguez would be subject to a lifetime ban under the holding of *Perez* because he committed at least three separate violations of the Program involving at least three distinct Prohibited Substances, and thus would receive a 50-game suspension for his use of the first substance (*e.g.*, testosterone), a 100-game suspen-

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

sion for his use of the second substance (*e.g.*, hGH), and a lifetime ban for his use of the third substance (*e.g.*, IGF-1). Accordingly, MLB asserts that when compared to the lifetime ban that Rodriguez would have received if the Commissioner was bound to follow the progressive penalty structure contained in Section 7.A, the suspension of Rodriguez for the remainder of the 2013 season and the 2014 season was indeed reasonable and appropriate. However, because the Commissioner did not impose a lifetime ban on Rodriguez, and because neither the Commissioner nor this Panel is bound by the penalty structure of Section 7.A, it is not necessary to determine whether a lifetime ban of Rodriguez would be supported by the language of Section 7.A and the *Perez* precedent.

However, at a minimum, it cannot be disputed that if Rodriguez was found to have used three distinct PES -- IGF-1, testosterone, and hGH -- on three separate occasions, and was subjected to a 50-game suspension as a first-offender for each violation (rather than being progressively disciplined pursuant to the 50/100/life structure), Rodriguez still would be assessed a 150-game suspension (*i.e.*, a 50-game suspension for each violation), which is a penalty in the range of the suspension imposed by the Commissioner, without even factoring in Rodriguez's obstruction of MLB's investigation or the prolonged time period (covering parts of three seasons) and frequency with which he used and possessed the three Prohibited Substances. Thus, if the penalty structure in Section 7.A is used as a guide as to the appropriate discipline for violations involving multiple uses/possession of different banned substances, Rodriguez's conduct would merit no less than a 150-game suspension.

Nor is the suspension upheld herein out of line with past just cause precedents in the industry, many of which involve suspensions for use or possession of Drugs of Abuse. As an initial matter, the plain language of the JDA shows that the negotiating parties have placed special emphasis on violations involving PES, as opposed to violations involving Drugs of Abuse, which are punished separately. When compared with the schedule of penalties for Drugs of Abuse in Section 7.C, it is obvious that PES violations are punished far more severely, which is not surprising given that PES more directly affect the integrity of competition and the game as a whole.

The longest individual just cause suspension on record for an MLB Player for any offense is 119 days issued in 1992 to Steve Howe.[18] Howe was a repeat offender for cocaine

---

[18] *Steve Howe*, Panel Dec. No. 95 (Nicolau, 1992).

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

abuse after entering into a "last chance" agreement for this offense two years earlier. After pleading guilty to a charge of attempted cocaine possession, MLB banned Howe for life. In the appeal to that suspension, the Panel found a lifetime ban was not supported by just cause, and that 119 days was more consistent with the suspensions of other Players, as well as reflective of various mitigating factors. The MLBPA and Rodriguez thus maintain any penalty for a first offender cannot approach the length of suspension given Howe, who was a habitual offender. Although instructive with regard to the just cause evaluation required here under the JDA, *Howe* hardly serves as a ceiling to the multiple PES violations committed by Rodriguez. As reflected by the widely divergent penalty schedules set out in Sections 7.A (PES) and 7.C (Drugs of Abuse), the parties view PES violations to be far more serious violations than those involving Drugs of Abuse deserving far more severe penalties. Howe also presented considerable evidence in mitigation of his offense, evidence which is not present here.

The MLBPA's reliance on the 2006 case of Jason Grimsley is also misplaced. Grimsley is the only player on record with a non-analytic positive for PES prior to the initiation of this grievance. But the 50-game suspension ultimately issued to Grimsley arose out of the alleged use or possession of one discrete substance (hGH), involved an alleged period of use or possession that was significantly shorter than the period of use or possession proven here, and also included allegations dating back to 2005, when first-time hGH violations were punishable under the JDA by a maximum 10-game suspension [PA 16] and when the JDA did not expressly cover discipline for "non-analytical positives." In the current contractual framework, the multiple PES violations committed by Rodriguez make any comparison with Grimsley unavailing.

More informative is the 100-game suspension received in 2012 by Guillermo Mota for a second PES violation. Mota did not contest his 50-game suspension in 2006 for a first offense under the JDA after testing positive for a PES. In 2012, he received a 100-game suspension for a second offense after testing positive for a different PES. On appeal, the Panel upheld the 100-game suspension under the express language of Section 7.A, despite finding Mota's ingestion of a PES contained in a cough syrup taken to treat a cold was unintentional.[19] Even accounting for the progressive nature of Mota's second suspension, Rodriguez's repeated and prolonged use and possession of multiple Prohibited Substances in 2010, 2011, and 2012 are

---

[19] *Guillermo Mota*, Panel Dec. No. 130 (Horowitz, 2012).

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

far more severe than the violations committed by Mota, whether viewed separately or as a whole.

On the other hand, no MLB player has been suspended for any substance abuse violation longer than one season.  The suspension imposed by MLB for Rodriguez in August 2013 did not extend beyond the 2014 season.  Given the comparative penalties received by MLB Players[20] for PES violations and other drug violations in the past, the disciplinary framework of the JDA, the fact that Rodriguez had no prior PES offenses, the number and frequency of Rodriguez's intentional violations of the JDA, the prolonged time period over which Rodriguez's violations occurred (covering portions of three baseball seasons and off-seasons), the number and forms of Prohibited Substances that Rodriguez used and possessed, and the incidents of attempted obstruction discussed above, a suspension of the entire 2014 season and 2014 postseason is supported by just cause.  It is recognized this represents the longest disciplinary suspension imposed on a MLB Player to date.  Yet Rodriguez committed the most egregious violations of the JDA reported to date, and engaged in at least two documented attempts to cover up that behavior in violation of the Basic Agreement.  A suspension of one season satisfies the strictures of just cause as commensurate with the severity of his violations while affording Rodriguez the opportunity to resume his playing career in the 2015 season.

The contentions by Rodriguez and the MLBPA that the period of suspension must be reduced or eliminated due to misconduct by MLB is not supported by the evidence.  Rodriguez and the MLBPA argue that mitigation is warranted because Bosch was coerced to cooperate by MLB and improperly compensated for his testimony.  Because of the severity of the allegations in the initial *Miami New Times* report, MLB had a legitimate interest in obtaining accurate information about Bosch's involvement with MLB Players.  When Bosch refused to cooperate, MLB resorted to civil action to obtain the information it required.  Certainly this tactic and the cooperation agreement later reached convinced Bosch to come clean with MLB about his activities with MLB Players.  Resort to the legal system, however, does not amount to coercion.  Moreover, the benefits accorded Bosch under that arrangement did not involve inducements that the Panel considers to be improper.  Rather, it was not inappropriate for MLB to

---

[20] Contrary to the request of Rodriguez, the fact and duration of suspensions received by other players involved in the Biogenesis matter cannot be considered by the Panel.  Those cases were settled by MLB and the MLBPA on a non-precedential basis which prevents the Panel from drawing any inferences concerning the culpability of those players or the appropriateness of their suspensions.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

reimburse Bosch for the attorneys fees he incurred as a result of his cooperation with MLB, and the reimbursement of those fees (which he would not have incurred but for his cooperation) did not undermine the credibility of his unrebutted testimony -- testimony which was corroborated by substantial documentary evidence.  The reimbursement for security expenses addressed Bosch's legitimate concerns for his personal safety.  And unlike the Panel precedents cited by the MLBPA, here it cannot be said that MLB's alleged misconduct contributed in any way to the Player conduct that triggered MLB discipline.

Also unfounded are the charges of improper conduct by MLB investigators during the investigation.  It is recognized MLB paid Gary Jones $125,000 in cash for copies of documents.  But counsel for Rodriguez has acknowledged similar payments and offers were made by Rodriguez for those and other documents relating to his case.  Regarding the indiscreet sexual liaison by one MLB investigator with a former Biogenesis employee, that liaison did not yield any information relevant to the investigation or the suspension herein.  Bruli Medina Reyes testified that MLB induced him to sign the disputed affidavit with threats of immigration difficulties, but without corroboration his claim cannot be credited.  Medina was not a credible witness, and his demeanor under oath and contradictory declaration rendered all of his testimony suspect and unreliable.  Accordingly, there is no basis in this record to reduce much less expunge the length of the suspension.

*Conclusion*

Based on the entire record from the arbitration, MLB has demonstrated with clear and convincing evidence there is just cause to suspend Rodriguez for the 2014 season and 2014 postseason for having violated the JDA by the use and/or possession of testosterone, IGF-1, and hGH over the course of three years, and for the two attempts to obstruct MLB's investigation described above, which violated Article XII(B) of the Basic Agreement.  While this length of suspension may be unprecedented for a MLB Player, so is the misconduct he committed.  The suspension imposed by MLB as modified herein is hereby sustained.[21]

///

---

[21] In accordance with Section 7.H.2, of the JDA, Rodriguez shall lose 162 days of pay for the 2014 season.

CONFIDENTIAL PER SECTION 6.A.3. OF THE JDA

## AWARD

The grievance is sustained in part and denied in part. MLB has just cause to suspend Alexander Rodriguez for the 2014 season and 2014 postseason.

DATED:  January 11, 2014
Santa Monica, California

_____
FREDRIC R. HOROWITZ, Panel Chair

_____     _____
I Dissent                                                        I Concur
DAVID M. PROUTY                                    ROBERT D. MANFRED, JR.
Players Association Member                   Office of the Commissioner Member